Renee SHURR, Special Administrator of the Estate of Russell Shurr, Deceased; Renee Shurr, individually; et al., Plaintiff,

v.

A.R. SIEGLER, INC., a/k/a Lear Romec, Division of Lear Siegler, Inc., a/k/a Romec Division of Lear Siegler, a/k/a A.K. Siegler, Inc., a/k/a Lear Romec, a Division of Crane Corp., a/k/a Lear Romec Division of Crane, Co., et al., Defendant.

No. 95–C–364.

United States District Court, E.D. Wisconsin.

Nov. 10, 1999.

As Amended Dec. 16, 1999.

902

Charles J Hausmann, Jeffrey P Zarzynski, Hausmann–McNally, Milwaukee, WI, Raymond Paul Johnson, Johnson Law Office, Los Angeles, CA, for Renee Shurr, Gwen Schlicht, Valerie Russell, Ione Starszak, Debra J Foran.

Russell A Klingaman, Hinshaw & Culbertson, Milwaukee, WI, Reid S Jacobson, Louis W Brydges, Sr, John W Dixon, Hinshaw & Culbertson, Waukegan, IL, for AR Siegler Inc, Lear Romec Corp, Hydro-Aire Co.

Russell A Klingaman, Hinshaw & Culbertson, Milwaukee, WI, Reid S Jacobson, Louis W Brydges, Sr, John W Dixon, Hinshaw & Culbertson, Waukegan, IL, Henry B Goddard, Mark A Dombroff, Terence M Healy, Dombroff & Gilmore, Washington, DC, for Crane Co.

Patrick W Schmidt, Jeffrey K Spoerk, Eric J Van Vugt, Quarles & Brady, Milwaukee, WI, for Lear–Siegler Inc, BFM Aerospace Corporation.

Michael R Wherry, Michael K Scott, Davis & Kuelthau, Milwaukee, WI, Keith Gerard, Richard C Coyle, Perkins Coie, Seattle, WA, for Boeing Co.

Michael R Wherry, Michael K Scott, Davis & Kuelthau, Milwaukee, WI, Russell A Klingaman, Hinshaw & Culbertson, Milwaukee, WI, Keith Gerard, Richard C Coyle, Perkins Coie, Seattle, WA, Reid S Jacobson, Louis W Brydges, Sr, John W Dixon, Hinshaw & Culbertson, Waukegan, IL, for Underwriters at Lloyds of London, The.

Henry B Goddard, Mark A Dombroff, Terence M Healy, Dombroff & Gilmore, Washington, DC, for Crane–Hydro–Aire Inc.

### *DECISION AND ORDER*

ADELMAN, District Judge.

On December 10, 1993, six Air National Guard maintenance crew members were killed when a KC–135R tanker aircraft exploded as they inspected its fuel system at General Billy Mitchell International Airport in Milwaukee. This action is brought by the surviving spouses of five of the Air National Guard members. Plaintiffs allege that a fuel pump installed in the airplane six days before the explosion was defectively designed and manufactured, and have sued Crane Company ("Crane"), which made the pump, and the Boeing Company ("Boeing"), which issued a set of specifications for the fuel pump and approved an earlier version. Before me are defendants' motions for summary judgment and Crane's motion for partial summary judgment on punitive damages.[1]

## I. JURISDICTION

A district court has subject matter jurisdiction over cases between citizens of different states. 28 U.S.C. § 1332(a)(1). Diversity of citizenship is present only if no defendant shares state citizenship with any plaintiff. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). In considering subject matter jurisdiction sua sponte, as I must, *Rice v. Rice Foundation*, 610 F.2d 471, 474 (7th Cir.1979), I discovered several issues which needed to be addressed, and held a telephone conference with the parties to do so. First, all plaintiffs are Wisconsin citizens in their personal capacities. (R. 60 ¶¶ 5–13.)[2] However, their citizenship for the claims they assert as executors or administrators of decedents' estates is determined not by their citizenship, but by that of decedents, 28 U.S.C. § 1332(c)(2), and their pleadings are silent regarding decedents' citizenship. The parties stipulated that decedents were Wisconsin citizens. (R. 169 ¶ 1.) Second, two defendants which were Crane predecessors or are Crane subdivisions denied in their answers that they were foreign corporations and that their principal places of business were in other states. (R. 70 ¶ 18 (BFM Aerospace Corp.); R. 71 ¶ 17 (Lear Siegler, Inc.).) All parties stipulated that all Crane predecessors and subdivisions with independent existence are foreign to Wisconsin and have their principal places of business elsewhere; Crane's counsel said that he could stipulate on their behalf. (R. 169 ¶¶ 2–3.)

The third issue arises from the presence of multiple sets of Underwriters of Lloyds of London as defendants in the case.[3]

1. Plaintiffs have acceded to Boeing's motion for partial summary judgment on punitive damages. (R. 143.) I will therefore grant that motion.

2. Actually, this was formally disputed. Three defendants, Boeing, Lear Siegler, Inc., and BFM Aerospace Corp. (the latter two are related to Crane), answered that they lack "knowledge or information sufficient to form a belief as to the truth of the[se] allegations." (R. 68, 70, 71.) This "has the effect of being a denial," Fed.R.Civ.P. 8(d), and thus plaintiffs' citizenship in their own right is technically denied. But no evidence has been offered to cast doubt on plaintiffs' assertions, so I find that plaintiffs are indeed Wisconsin citizens.

3. Plaintiffs allege that Lloyds underwriters insured each of the other seven defendants: A.R. Siegler, Inc., Lear Romec Corp., Hydro–Aire Co., Lear Siegler, Inc., BFM Aerospace Corporation, Crane, and Boeing. (R. 60 ¶ 24.) Answers were filed admitting that

Lloyds of London is an unincorporated association whose member "names," or underwriters, join syndicates which in turn join together to issue insurance policies. *Indiana Gas Co. v. Home Ins. Co.*, 141 F.3d 314, 316 (7th Cir.1998), *cert. denied sub nom. Certain Underwriters at Lloyd's, London v. Indiana Gas Co.*, —— U.S. ——, 119 S.Ct. 339, 142 L.Ed.2d 280 (1998). Each name—frequently a natural person—bears unlimited personal liability, but may be sued only through the syndicate or the lead underwriter on a given policy. *Id.* at 316–17. Hundreds of names may be members of a given syndicate. *Id.* at 316. Under Seventh Circuit precedent, if a Wisconsin citizen is one of the names participating in any of the syndicates participating in any of the relevant policies, diversity is destroyed and the case must be dismissed. *Id.* at 319.

To avoid this prospect, plaintiffs moved under Fed.R.Civ.P. 21 to dismiss the Lloyds underwriters as defendants. (R. 169 ¶ 4.) All parties (including all Lloyds underwriters who filed appearances, represented by counsel for Crane and for Boeing) stipulated that the underwriters were not necessary parties under Fed.R.Civ.P. 19(a). *Id.* Because I see no reason to suspect otherwise, I grant plaintiffs' motion.

I therefore find that plaintiffs and their decedents are all Wisconsin citizens, (R. 60 ¶¶ 5, 7, 9, 11, 13; R. 169 ¶ 1), and that all remaining defendants are foreign corporations with non-Wisconsin principal places of business (R. 68 ¶ 20; R. 72 ¶ 19; R. 169 ¶ 2–3). Thus, this court has diversity jurisdiction.

## II. FACTS

KC–135R tanker aircraft provide air-to-air refueling to other military aircraft.

The KC–135R's fuel system includes several fuel tanks and pumps to move fuel from the tanks, both to supply the KC–135R's own engines and to refuel other aircraft while flying. The fuel pumps are mounted inside the fuel tanks themselves. They are therefore continuously submerged in jet fuel, or, more dangerously, in a mixture of jet fuel and air, which is, as Crane acknowledges, an "explosive environment." (R. 88 at 40.)

One of the fuel pumps in the KC–135R which exploded was a Lear Siegler model RR12280A pump.[4] This pump has a cast-aluminum housing and is driven by an electric motor. The motor is powered by four 18-gauge wire leads, three "hot," and the fourth a neutral ground. These motor lead wires feed into the top of the pump, the "end bell." The motor is cooled by jet fuel, which enters and exits the pump's housing from the fuel tank through vent holes. One of the vent holes, referred to as the upper vent hole, is located at the top of the end bell, directly over the wire passage.

The pump's design thus calls for running "hot" electric wires through an explosive mix of jet fuel and air. To reduce the risk of fire and explosion, the wires are individually insulated. In addition, the design calls for a Teflon insulation sleeve to be placed over each wire.

The KC–135R's pump was recovered largely intact after the explosion and resulting fire. It was examined by both plaintiffs' and defendants' experts, and twice by the Air Force. These investigations revealed that the red motor lead wire (one of the "hot" wires) had arced inside the pump's end bell, burning through three

Lloyds policies insured Lear Romec Corp. (R. 74 ¶ 1), Crane (*id.*), and Boeing (R. 69 ¶ 2).

**4.** Lear Siegler is a predecessor division of Crane. All future references to Lear Siegler and intervening entities will be to "Crane." The RR12280A pump was designed as a booster pump for use on the B–52 aircraft, but was being used as an override pump on the KC–135R aircraft when it exploded. (R. 134 at 23.) No party has ascribed any significance to the pump's being used as a larger override pump on a smaller plane, rather than, as designed, a smaller booster pump on a larger plane.

of its seven strands and its red insulation. Although a Teflon insulation sleeve is present on the red wire, plaintiffs' and Crane's experts agree that the red wire is approximately 5.5 inches long but that the Teflon sleeve runs for only 1.75 to 2 inches of that length. (R. 112 Ex. B ¶ 8, Ex. 23 at Fig. 53(b); R. 89 Ex. C ¶¶ 5, 7 & Ex.)

The pump's aluminum end bell housing showed extensive evidence of localized heat damage at the upper vent hole. The Air Force found that arcing created a pit nearly half-way through the pump's housing and enlarged the vent hole itself. (R. 112 Ex. 2 ¶ III.4.) Energy dispersive X-ray analysis of the interior of the end bell revealed the presence of several elements—fluorine and carbon—found in the insulation on the motor lead wires. (R. 112 Ex. B ¶¶ 10–11, Ex. 22.) This suggests that the motor lead wires melted against the interior of the end bell. (R. 112 Ex. B ¶ 11.) In addition, X-ray analysis found copper on both the interior of the vent hole in the end bell and on the exterior of the end bell immediately outside the vent hole. (Id. ¶¶ 11, 13; R. 112 Ex. 22.) Copper melts at 1940 degrees Fahrenheit. (R. 112 Ex. 1 at J–9.) The presence of cooled copper both inside and outside the upper vent hole suggests that the intense heat of the arcing may have caused the copper in the wire to have melted into plasma and then forcibly ejected—through the vent hole, out from the pump's end bell, and into the explosive mix of jet fuel and air inside the fuel tank. (Id.; R. 112 Ex. B ¶ 13.) X-ray analysis shows carbon on the exterior of the aluminum end bell near the upper vent hole, which plaintiffs' expert attributes to fire soot. (R. 112 Ex. B ¶ 13.)

A series of Air Force simulation experiments following the explosion found that molten metals, principally aluminum, could be ejected through a vent hole in a closed aluminum block when a copper wire inside the aluminum block was made to arc close to the vent hole, and that the energy in such ejected debris or plasma "is capable of igniting any flammable hydrocarbon." (R. 112 Ex. 2 at 5.)[5]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of a factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

The moving party has the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must "go beyond the pleadings" and designate

---

**5.** The Air Force experiments also showed that—with difficulty—an arc inside the closed chamber could sometimes throw out an external arc, as well as molten metal. (R. 89 Ex. 2 at 4, 5.)

specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). Both parties must produce documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

## IV. SUFFICIENCY OF PLAINTIFFS' EVIDENCE

■ Crane leaves largely unaddressed the merits of plaintiffs' allegations of strict liability, negligence, and breach of warranty. For that reason, even if I found that plaintiffs had not presented adequate evidence to persuade a rational jury of the elements of their claims, Seventh Circuit law would prohibit me from entering summary judgment against them on that basis.[6] Nonetheless, it is useful to summarize plaintiffs' theory of why Crane's design and manufacture of the RR12280A pump was defective; this is the central element to plaintiffs' claims that Crane is liable under negligence, strict liability, and breach of warranty.

If accepted, plaintiffs' evidence would establish these defects: (1) most importantly, placing a vent hole in the motor lead wire passage, even though nothing in that passage requires cooling and the possibility of the motor lead wires' arcing created an unnecessary risk of sparks, arcing, and molten metal being expelled through the vent hole into the combustible mix of air and jet fuel in the fuel tank (R. 112 Ex. A ¶¶ 7–8); (2) using a pump housing which was explosion proof tested on a version which did not include the upper vent hole, and which in practice was not explosion proof and failed to contain arcing and sparking within the pump (*id.* ¶¶ 11–12); (3) providing a Teflon insulation sleeve along only a portion of the red wire's length, rather than along its full length, thereby increasing the risk of arc-

6. Summary judgment may be entered for a defendant on a ground other than one the defendant has urged, but where the defendant has not challenged the merits of a plaintiff's prima facie case, the court may not enter such a judgment based on a sua sponte determination that the plaintiff has not adequately supported the complaint's factual allegations; judgment in such a case may be entered against the plaintiff only if based on a court-supplied legal argument. *See Board of Nat'l Missions of Presbyterian Church v. Smith,* 182 F.2d 362, 364–65 (7th Cir.1950) ("The fact that the judgment was granted on a reason different from that assigned by the defendant is immaterial, where, as here, the motion was properly granted on the undisputed facts shown and on an issue presented by plaintiff's complaint"; district court had granted judgment based on construction of decedent's will even though defendant had not raised that issue); *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989) ("But it was not Malhotra's burden to produce evidence concerning claims as to which Cotter's sole ground for summary judgment was the statute of limitations. When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B— a ground that the movant might have presented but did not."); *Hartman v. Board of Trustees of Community College Dist. No. 508,* 4 F.3d 465, 469 (7th Cir.1993) ("Because defendants' arguments did not attack the factual predicate of Hartman's claim, she was under no obligation to improve on it by adducing more specific facts, and the claim should not have been dismissed for her failure to do so."). *See also Wolf v. Buss (America) Inc.,* 77 F.3d 914, 921 n. 2 (7th Cir.1996) (2–1) (majority considered grounds for summary judgment not urged by employment discrimination defendant, over explicit dissent and only because "Buss America's motion for summary judgment squarely addresses the merits of Wolf's claim.").

ing and sparking from the areas unprotected by the Teflon insulation (*id.* ¶¶ 35–36); (4) allowing burrs and insufficiently smooth machining at the junction of the vent hole and the wire passage, which may have abraded the wires and caused them to arc directly in front of the vent hole (*id.* ¶ 23); (5) using a low class of aluminum casting for the pump housing, allowing molten aluminum to be expelled through the vent hole (*id.* ¶ 22); (6) using seven-strand and 600–volt type "E" wire rather than the more flexible, better insulated, and higher voltage nineteen-strand and 1000–volt type "EE" wire required in the specifications (*id.* ¶¶ 40–42, 45); and (7) tightly bundling, twisting, and turning the four motor lead wires, as well as not providing sufficient space for them, all of which weakened their insulation (*id.* ¶¶ 32–33).

■ Crane has challenged the adequacy of plaintiffs' evidence to support the elements of their prima facie claims in only two areas, explosion proof testing and evidence of defective machining and burrs. Neither challenge is appropriate for decision, because Crane raises these arguments only in its reply brief.[7]

First, Crane contends that any alleged deficiencies in the explosion proof testing are irrelevant, because the test was designed to see whether the pump design prevented sparks from being emitted (R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23.2.(a)), and would have little bearing upon whether molten metal could be emitted. Crane thus denies any causal link between the alleged deficiencies in the explosion proof testing and plaintiffs' theory of how the explosion occurred. (R. 116 at 17.)

Second, Crane contends that plaintiffs' evidence of defective machining which may have allowed burrs at the junction of the vent hole and the wire passage is too speculative to be considered under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and must therefore be set aside. (R. 116 at 21–22.)

■ However, these issues are not properly before me, because Crane raises them for the first time in its reply brief. Local Rule § 6.01(c) requires that, "A reply brief shall be limited to matters in reply." The intent of this rule is to ensure that a responding party has a full and fair opportunity to respond to all of the moving party's arguments and is not subjected to "sandbagging." In addition, providing all arguments for summary judgment in the moving party's initial brief allows the record and the parties' arguments to be fully developed for the court's consideration. When an issue is raised for the first time in a reply brief and the opposing party has no opportunity to respond, any part of the motion based on the new issue will be denied. *Schimpf v. Gerald, Inc.,* 52 F.Supp.2d 976, 1000 (E.D.Wis.1999).

## V. CRANE'S GOVERNMENT CONTRACTOR DEFENSE

■ Crane has moved for summary judgment based on the government contractor defense. As we will see, Crane faces a high evidentiary burden: it must establish that the government approved each specific design feature in question in an exercise of discretion balancing technical, military, social, and safety considerations. *Boyle v. United Technologies Corp.,* 487 U.S. 500, 511–12, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, retains governmental immunity for "Any claim based upon an act or omission of an employee of the Government, exercising due care ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." 28 U.S.C.

---

**7.** Crane's motion for summary judgment rested solely on the government contractor defense, and did not refer even in passing to the

elements of negligence, strict liability, or breach of warranty. (R. 88 at 2, 6, 42.)

§ 2680(a). *Boyle* extended this discretionary function immunity to displace military contractors' liability under state tort laws in certain cases: those where the government exercised discretion by ordering equipment from a contractor in a manner that prevented the contractor from "comply[ing] with both its contractual obligations and the state-prescribed duty of care." *Boyle*, 487 U.S. at 509, 108 S.Ct. 2510. Displacing the contractor's state tort liability in such cases is appropriate, the Court ruled, because the government's responsibility in "select[ing] the appropriate design for military equipment ... often involves not only engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511, 108 S.Ct. 2510.

■ To demonstrate that such an exercise of governmental discretion and judgment truly was involved in a particular military procurement, and thereby relieve itself of tort liability under state law, a contractor must establish that: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512, 108 S.Ct. 2510. The purpose of these requirements is to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.*

■ Consideration of the first *Boyle* requirement—government approval of reasonably precise specifications—is largely sufficient to resolve the issues before me.

The courts have identified several instances which satisfy the requirement. The most obvious occurs where the government provided the precise specifications and precise manner of construction. *Boyle*, 487 U.S. at 509, 108 S.Ct. 2510.[8] The standard is also satisfied where there is a "continuous back-and-forth" between the contractor and the government, with the government "making final decisions as to specifications." *Koutsoubos v. Boeing Vertol*, 755 F.2d 352, 355 (3rd Cir.1985).

■ Under *Boyle*'s "approv[ing] reasonably precise specifications" standard, as elaborated by one panel of the Fifth Circuit, "once the government has delegated authority to the private contractor to make important choices, the government does not exercise a discretionary function by merely accepting the contractor's work." *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1485 (5th Cir.1989). The government's approval, "at a minimum, must involve judgment or policy choice to fall within the discretionary function exception." *Id.* at 1484. The government's merely approving the contractor's final designs, without any substantive review or evaluation, is rubber-stamping and not approval under *Boyle*. *Id.* at 1480. In sum:

> If the government delegates its design discretion to the contractor and allows the contractor to develop the design, the government contractor defense does not apply. If the government has so delegated its discretion to the contractor, mere government acceptance of the contractor's work does not resuscitate the defense unless there is approval based on substantive review and evaluation of the contractor's design choices.

*Id.* at 1486.

*Smith v. Xerox Corp.*, 866 F.2d 135, 138 (5th Cir.1989), decided by a different panel

---

**8.** This was the case in a recent decision which Crane brought to the court's attention. In contrast to the facts here, the government there specified the product's design and provided the detail drawings setting out the relevant specifications. *Quiles v. Sikorsky Aircraft*, No. 98–11208–DPW, unpub. op. at 4, 7 (D.Mass. Sept. 8, 1999). *Quiles* thus does not help Crane establish its burden of proving that the government "approved reasonably precise specifications ... [for] the design feature[s] in question." *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510.

of the Fifth Circuit on the same day as *Trevino*, held that *Boyle* 's "approv[ing] reasonably precise specifications" standard, 487 U.S. at 512, 108 S.Ct. 2510, was met where a contractor's product incorporated government environmental specifications and the government "reviewed and approved [the contractor's] final drawings and specifications." I find *Trevino* 's analysis more persuasive because it emphasizes that the bare fact that a government office approved a given configuration in a contractor's specifications is inadequate assurance that uniquely governmental discretion was used in balancing the necessary technical, military, social and safety trade-offs. *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510. By contrast, *Smith* reports merely that the military "reviewed and approved" the contractor's specifications, and does not specify the rigor of or judgment involved in the military's review and approval process. Nonetheless, I do not consider *Smith* contrary to *Trevino; Trevino* 's analysis would lead to the same result in *Smith* if the military's review and approval of the contractor's final drawings and specifications did not "merely accept[ ] the contractor's work," *Trevino*, 865 F.2d at 1485, but was substantive and reflected a policy or judgment choice, *id.* at 1484.

To whatever extent *Smith* and *Trevino* do require different levels of governmental review for a contractor to be relieved of liability, the Seventh Circuit has followed *Trevino* 's more demanding requirement. *See Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 998–99 (7th Cir.1996) (*citing Trevino* twice and quoting it once on the issue; *neither citing nor quoting Smith* on the issue).

The kind of substantive review and evaluation that is required to find government approval is illustrated in *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir.1989). In that case, the plaintiff alleged that, due to design defects, wire chafing caused an F–16's flight instruments to malfunction and so caused a fatal crash. In a manner similar to this case,

the Air Force had issued a Request for Proposals for the F–16 aircraft, which included general specifications. In response, General Dynamics provided proposed detailed specifications, which were evaluated by the Air Force Systems Program Office:

> The Office conducted an extensive review of the aircraft, including the electrical system, examining specifications, drawings, and blueprints. One group of Air Force engineers was specifically assigned to review of the electrical system. The Air Force conducted independent review and analysis of the electrical system design, and evaluated designs in a Preliminary Design Review, Critical Design Review, and later Physical Configuration Audit.

*Id.* at 1320 (citations to the record omitted). The Eleventh Circuit found that this level of detailed review of the electrical system alleged to be defectively designed was sufficient to satisfy *Boyle* 's requirement, 487 U.S. at 512, 108 S.Ct. 2510, that the government "approve[ ] reasonably precise specifications." *Harduvel*, 878 F.2d at 1320.

In *Oliver*, the Seventh Circuit likewise found final governmental decision-making for a product's design where the Marine Corps assumed "complete responsibility" for testing a contractor's prototype transport vehicle, and identified "literally . . . hundreds" of changes for the contractor to incorporate into the design. *Oliver*, 96 F.3d at 996. Crucially, those changes required adding a new fuel tank—which exploded in a rear-end accident—on the exhaust system's side of the vehicle. Meeting the government's other size requirements led the contractor to place the new fuel tank only 1.5 inches from the exhaust pipe. The Seventh Circuit ruled that, regarding the placement of the new tank, "It is clear, therefore, the Marine Corps did not leave 'the critical design decisions to the private contractor,' *Trevino*, 865 F.2d at 1480, but rather that the Corps worked with Oshkosh

every step of the way." *Oliver*, 96 F.3d at 996–97 (*citing Harduvel*, 878 F.2d 1311, 1320; *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 700–01 (4th Cir.1989)).

A similar analysis is presented in *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744 (9th Cir.1997). In that case, the contractor proposed detail specifications and drawings, and, after requiring a number of changes, the military examined, reviewed, and approved final detail specifications and drawings. Despite this apparent evidence that the government had approved precise specifications, the court found that the contractor fell short of proving that the government had actually exercised discretion for the "the design feature in question," *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510:

> Each drawing was signed by a government representative to indicate approval. But that evidence does not establish as a matter of law that the government exercised its discretion with respect to the drive shaft and its components. On the contrary, testimony of the Bell official in charge of dealing with the military about the design of the helicopter, who attended all of the design meetings, was that there were no discussions with the government about the design of the critical isolation mounts.

*Snell*, 107 F.3d at 748.

I make three final observations about the government contractor defense before turning to the specifics before me. First, as *Snell* suggests, it is crucial to be clear about the burden and quantum of proof a defendant must provide on summary judgment when asserting the government contractor defense. At any stage of litigation, the contractor "carries the burden of proving each element of the government contractor defense." *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996). When seeking summary judgment, the contractor must prove the first *Boyle* standard to such a degree that no reasonable juror could find otherwise, *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548:

that the government's approval was a substantive exercise of its discretion to balance technical, military, social and safety trade-offs, *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510, and that "the design feature in question was considered by a Government officer," *id.* at 512, 108 S.Ct. 2510.

Second, as indicated by the analysis above of the distinction between rubber-stamping and substantive and meaningful review, many contractors will not be eligible for this defense, even though their detail drawings were approved by the government and showed the design features which a plaintiff later alleges were defective. This may raise the question of what the contractor was expected to do to become eligible for the defense. The answer is that contractors, even government contractors, have no entitlement to blanket immunity from later allegations of negligence. When a contractor prepares designs in any other setting, it is liable for any negligence, even if its customer approves its designs. No immunity for negligence arises merely because the federal government is the customer. The government contractor defense is available only where the contractor could not both comply with its contract and satisfy its state-prescribed duty of care. *Boyle*, 487 U.S. at 509, 108 S.Ct. 2510. Where there is not adequate evidence that the government specifically considered and, after substantive and meaningful review, approved a given design feature proposed by the contractor, *id.* at 511–12, 108 S.Ct. 2510, the contractor must answer allegations of negligence just as it would be in any other case. Without such evidence, "it is impossible to say that the Government has a significant interest in that particular feature," *id.* at 509, 108 S.Ct. 2510, and thus no interest is advanced by providing immunity for negligence associated with the particular feature.

Third, that said, a defendant's failure to establish the government contractor

defense with regard to a particular design feature does not establish a plaintiff's corresponding affirmative case. It will often be the case that a contractor's specifications and detail drawings show precisely what the finished product looked like, and that the government contractor defense does not apply solely because of a lack of adequate evidence that the government specifically considered and approved the design feature in question. The absence of that evidence, however, does not aid the plaintiff's ultimate burden of proving that the contractor violated a duty of care.

## A. Specifications and Approvals in the Procurement of the RR12280A Pump

Considering Crane's motion requires exploring the details, now more than thirty-five years old, of the design, specification, and procurement process for the RR12280A pump. Crane must establish the *Boyle* elements from what evidence still exists; to prevail on the government contractor defense, it must prove its case in the face of the inevitable gaps in the record after such a time. However, there is no fundamental unfairness here; whatever relevant records have been lost were at one time in its control or the control of persons with whom it was in privity of contract, and would never have been in plaintiffs' control.

### 1. Overview

In December, 1962, Boeing and the Air Force granted final approval to a predecessor to the RR12280A pump, the RR12280,[9] and a very similar companion pump, the RR12220, as pumps for Boeing to install as original equipment on particular B-52 aircraft. (R. 136 Ex. 4 (SCD 10-30322) at sh. 6; Ex. 9 (SCD 10-30319) at sh. 6). Production of the RR12280 and RR12220 began shortly thereafter, but within three months, due to problems with

the pumps' stator phase insulation and motor life, Boeing issued "no further procurement" orders for both pumps. In May, 1963, Crane submitted to Boeing plans for modified versions of the two pumps, the RR12280A and RR12220A, which addressed the motor problems. In December, 1963, Boeing granted the modified versions "design proposal approval"—Boeing's preliminary confirmation that the submissions met the basic specifications and that Crane could submit more detailed test results. Although Crane and Boeing exchanged correspondence for another two years about the test procedures needed for the RR12280A and RR12220A to win higher levels of approval from Boeing, Boeing never granted them any further approval.

Independently from its submissions to Boeing for inclusion as original B-52 equipment, in May, 1964, Crane submitted the RR12280A and RR12220A to the Air Force in response to an Air Force request for proposals for replacement B-52 pumps. Crane received a contract in August, 1964 to supply the Air Force with 460 RR12280A pumps and 106 RR12220A pumps. (R. 136 Ex. 21.) In November, 1964, after Crane submitted qualification test results, the Air Force approved the pumps and requested Crane to begin production and delivery. (R. 89 Ex. 42.) Ten years later, in 1974, the Air Force begin using the RR12280A booster pump as a replacement override pump on KC-135 aircraft.

### 2. Relevant requirements governing military contractors

Would-be military contractors in the 1960s needed to satisfy several overlapping layers of requirements. First, the military issued its own specifications. Some of these specifications were of quite general applicability. One specification, for example, provided standards for various grades of casting for all metal pieces used in

---

**9.** The RR12280's prototype model was called the P1547. The distinction between the P1547 and the RR12280 briefly becomes important on the issue of punitive damages, but until then, this decision will refer to both as the RR12280.

airplanes (R. 89 Ex. 18 (*intended to be* Ex. 37) (MIL–C–6021D)); a second provided requirements for all insulated electrical wire (R. 112 Ex. 15 (MIL–W–16878)). Other military specifications were more detailed, e.g., a 1954 general specification for fuel booster pumps, which provided pages of specifications about the performance requirements for such pumps and the testing procedures they needed to satisfy. (R. 112 Ex. 14 (MIL–P–5238A).)

Second, lead contractors on particular projects issued Source Control Drawings ("SCDs") for particular components of their overall projects. The relevant SCD here is Boeing's SCD 10–30322, issued in November, 1960. This SCD provided general specifications for the B–52's auxiliary booster pump and tracked which contractors' models had received Boeing and Air Force "final approval" to be installed as original B–52 equipment. (R. 136 Ex. 4 (SCD 10–30322).) Boeing also issued a "General Requirement Supplement to Source Control Drawings for Model B–52," which supplemented the SCD. (R. 136 Ex. 7 (SCD Supplement)). The SCD included a sketch with a largely empty box for the pump's interior design, but with much more detail about the external cable which would power the pump. (R. 136 Ex. 4 (SCD 10–30322) at 13.) As with the military's general specification for fuel booster pumps, Boeing's SCD included pages of performance and testing requirements. In addition, it specifically required that the pump must satisfy the military's general specification for fuel booster pumps. (*Id.* ¶ 2.1 (incorporating MIL–P–5238A by reference); ¶ 3.1.2.1 ("The pump shall conform to the applicable requirements of MIL–P–5238A unless specifically superseded by this specification.").)

Third, contractors submitting proposals in response to lead contractors' SCDs or military requests for proposals were required to submit their proposed product's specifications, test procedures to qualify their products, and test results. The specifications would typically include both an assembly drawing, showing how the individual components would fit together, and detail drawings, providing the information necessary to fabricate each individual component. Crane prepared assembly drawings for both the RR12280 (R. 136 Ex. 31) and the RR12280A (R. 89 Ex. 1; R. 136 Ex. 32; R. 112 Ex. 5 (drawing RR12280A)). Crane also prepared a detail drawing of the end bell housing used on both the RR12280 and RR12280A pumps (R. 89 Ex. 2; R. 112 Ex. 8; R. 136 Ex. 30 (drawing RG21604)).

In addition to preparing the assembly and detail drawings, Crane submitted detailed test procedure proposals for the RR12280 to Boeing and for the RR12280A pump to both Boeing and the Air Force. Crane corresponded extensively with both Boeing and the Air Force regarding the qualification test procedures for the RR12280A, and, based on its similarity to the RR12280, won approval from both Boeing and the Air Force to conduct less extensive qualification test procedures on the RR12280A. Crane submitted extensive test results for the RR12280 pump to Boeing, receiving "final approval" (with the Air Force's approval), and submitted test results for the RR12280A to the Air Force.

Further details about Crane's negotiations with Boeing and the Air Force and the relevant specifications are provided below as necessary.

**B. Government Contractor Defense as Applied to Plaintiffs' Allegations**

**1. Failure to comment: The argument from silence**

 Crane initially contends that because the Air Force approved its final detail drawings in November, 1964, after having requested four specific changes on several drawings in a June, 1964 letter (R. 89 Ex. 26), it necessarily gave substantive, meaningful review to all remaining design features. (R. 88 at 31.) Likewise, Crane contends that the Air Force's addressing only the immediate cause of failure—faulty

phase insulation causing a short circuit inside the motor—following a two-day tear-down of two failed RR12220 pumps on February 28 and March 1, 1963, indicated Air Force approval of all other features. (R. 116 at 16, 23, 24.)

█ I reject these arguments from silence. For summary judgment purposes, the absence of governmental comment upon a given design feature, even if other features were commented upon, simply cannot establish that, after substantive and meaningful review, a government officer considered and approved the design feature in question in an exercise of discretion balancing technical, military, social and safety trade-offs, as required by *Boyle*, 487 U.S. at 511–12, 108 S.Ct. 2510. It is just as possible to infer from the government's silence that the government rubber-stamped the design feature in question, in reliance upon the contractor's sound discretion, and did not conduct an independent review. For summary judgment purposes, all inferences are drawn in favor of the non-moving party.

It is worthy of note that three of the Air Force's four requested design changes in the July, 1964 letter addressed the RR12280A's rotor shaft. (R. 89 Ex. 26.) [10] The Air Force had notified Crane only six months before, in December, 1963, that rotor shafts had sheared on the first fifteen RR12280 pumps that had been received for repair. (R. 89 Ex. 4.) At a January, 1964, meeting held at an Air Force facility to discuss this problem, Crane agreed to redesign the RR12280's rotor shafts and to incorporate the redesigned rotor shafts into the RR12280A. (R. 89 Ex. 6 ¶ 3.d.) It is thus no surprise that when Crane submitted its RR12280A proposal four months later, in May, 1964, the Air Force looked closely at the rotor shaft design.

This is not a case where the military assumed "complete responsibility" for testing Crane's design or identified "literally ... hundreds" of changes for Crane to incorporate into its design. *Oliver*, 96 F.3d at 996. In *Oliver*, the contractor's placing a fuel tank dangerously close to the exhaust system was directly due to the government's requiring the contractor to change its initial design, which called for a single fifty-five gallon fuel tank on the opposite side of the vehicle from the exhaust system, to provide two seventy-five gallon fuel tanks. *Id.* at 996–97. By contrast, the government's four requested changes in this case—three of which related to the rotor shaft—in no way led Crane to change its design so as to place an upper vent hole in the wire passage, to avoid explosion proof testing the pump while it was operating, to avoid placing Teflon insulation over the full length of the motor lead wires, to use the class of aluminum casting it did, or to route the motor lead wires as it did. The government's silence about these design features in the face of its comments upon four other design features, three of which related to the rotor shaft, does not establish for summary judgment purposes that these design features were considered and approved by a government official after substantive and meaningful review.

█ Crane responded to the Air Force's request by accepting two of the requested changes and arguing against the wisdom of the others. The letter concluded, "We trust this letter and the attachments are sufficient for evaluation and acceptance of our offer." (R. 89 Ex. 29 at 3.) Crane argues that once this statement was made, the government had discretion over every aspect of the pump's design and testing, therefore entitling Crane to the government contractor defense. (R. 88 at 27.) This is mistaken. Design discretion originated in Crane, because Crane developed the pump. "[M]ere government ac-

---

**10.** The record before me does not make clear whether the fourth item, a washer, was related to the rotor shaft.

ceptance of the contractor's work does not resuscitate the defense unless there is approval based on substantive review and evaluation of the contractor's design choices." *Trevino*, 865 F.2d at 1486. The government's failure to comment provides no evidence of approval based on such substantive review and evaluation.

■ Similarly, the Air Force's participating in the two-day tear-down of two non-functioning RR12220 pumps in 1962 does not even establish that Air Force representatives took conscious note of the relevant design features—placement of the upper vent hole, amount of Teflon insulation on the motor lead wires, and so on—much less that they made a substantive and meaningful review and approved them. The purpose of the inspection was to determine why the pumps had failed and how to prevent similar future failures, not to evaluate the safety of pump features wholly unrelated to the immediate failures. Contrary to Crane's contention (R. 116 at 16), the Air Force's involvement in this tear-down does not establish a "continuous back and forth" between the supplier and the military regarding the location of the vent hole, the amount of Teflon insulation on the motor lead wires, or any other aspect of the pump's design. *Oliver*, 96 F.3d at 998 (*quoting Harduvel*, 878 F.2d at 1320 (*quoting Koutsoubos*, 755 F.2d at 355)). The Air Force's focusing on the immediate cause of failure, faulty phase-to-phase insulation, can in no way be considered an approval of all other features of the pump for purposes of the first *Boyle* element.

## 2. Specific Alleged Design Defects

### a. Location of vent hole

■ I turn now to Crane's government contractor defense as it applies to plaintiffs' specific allegations. Plaintiffs first allege that the RR12280A's upper vent hole is defectively located: the upper portion of the pump's end bell does not need to be cooled, and placing a vent hole there,

next to the motor lead wires, imposes a risk that an arc from one of the wires in the wire passage "could cause sparks or molten fragments to escape through the vent hole." (R. 112 ¶ 8.)

Crane contends that the government "approved reasonably precise specifications [for] the design feature in question," *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510, namely, the location of the upper vent hole. Crane bases its argument on four pieces of evidence. Three of them are comprised of the Air Force's exposure to the vent hole on various drawings before it purchased the pump, and at the February 28 and March 1, 1962 tear-down of two failed RR12280 pumps, all without having commented upon the vent hole's placement. (R. 116 at 14–16.) This is the argument from silence considered and rejected above.

■ Crane's best argument and evidence concern some notes from a November, 1962 engineering conference. Both the argument and the evidence are offered only with Crane's reply brief. (R. 116 at 13–14 & Ex. F.) As we have already seen, a moving party may not raise a new argument in a reply. In addition, a moving party may not submit new evidence with a reply to support a new argument. Local Rule § 6.01(c); *Boustead v. Barancik*, 151 F.R.D. 102, 107 (E.D.Wis.1993) (Gordon, J.). So long as the non-moving party did not place the new matter in issue in its response, the new matter and the evidence supporting it may both be disregarded. *Hartley v. Wisconsin Bell, Inc.*, 930 F.Supp. 349 (E.D.Wis.1996) (Gordon, J.); *Baugh v. City of Milwaukee*, 823 F.Supp. 1452, 1456 (E.D.Wis.1993) (Evans, C.J.), *cited with approval in Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 n. * (7th Cir.1996). Crane did not refer to the November, 1962 engineering conference in its original motion, and plaintiffs did not raise it in their response. It is a wholly new issue, and the notes taken at that conference accordingly do

not respond to matters placed in issue by plaintiffs' response.

Even on the merits, Crane's new evidence would not establish that the Air Force approved the vent hole placement in an exercise of discretion balancing technical, military, social, and safety considerations. *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510. The purpose of the conference was to respond to Crane's request to qualify both the RR12280 and RR12220 pumps with a single testing for nine required tests. To win this permission, Crane needed to establish that the RR12280 and RR12220 pumps were identical in all relevant aspects. Notes taken by a Crane employee read, "Explosion Test: End bell openings identical." (R. 116 Ex. F.) The notes for all nine tests total one and half pages; none is more than eight or ten words. Air Force representatives attended the conference.

This new evidence, even if considered, would be insufficient to establish as a matter of law that "the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510. The notes suggest only that the Air Force was told what the legend at the bottom of the end bell housing drawing already indicated, that the two pumps used the same end bell housing design,[11] and what Crane's later Qualification Test Report said, that the pumps had identical housings.[12]

Crane simply needed to establish that the pumps' housings and openings were identical. The most obvious inference from the notes, "End bell openings identical," is that Crane pointed out—or perhaps simply asserted—that the two pumps used

the same drawing, RG21604, for their end bell housings. The very brevity of the notes on the nine tests suggests that the conference participants did not review every design feature, or even every opening in the pumps' housing. Even if the end bell housing drawing was reviewed, the meeting was not called to assess the safety of Crane's design. There is no evidence of "discussions with the government about the design of the critical [vent hole placement]." *Snell*, 107 F.3d at 748.

According to its own account, Crane added the upper vent hole during a period that it was not required to consult with the government. (R. 116 at 18.) It has failed to establish that at any later time "the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510.

#### b. Explosion proof testing

■ Both the military's specifications and Boeing's SCD set out particular explosion proof tests to qualify the B–52 booster pump.[13] Crane conducted explosion proof testing on the RR12280 pump on June 5, 1961.

Plaintiffs contend that various defects in the testing shows that Crane does not pass the second *Boyle* test with regard to the location of the upper vent hole: even assuming that the government "approved reasonably precise specifications" for the vent hole's location, Crane did not "conform[ ] to those specifications," *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510, because it did not conform to the required testing specifications.

---

11. Indeed, the legend indicates that this drawing was used for all four pumps: both the RR12280 and RR12220 pumps, and both the RR12280A and RR12220A pumps. (R. 89 Ex. 30 (drawing RG21604)).

12. "Aside from the aforementioned changes, the rest of the [RR12280A] pump is identical to RR12280.... [The] housing and electrical

lead out are identical to the RR12280." (R. 89 Ex. 34 (TR–1307) ¶ 2.1.1.)

13. *See* R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23; R. 136 Ex. 4 (SCD 10–30322) ¶ 4.2.25. In addition, Boeing's SCD Supplement also contemplated that explosion tests would be required on some B–52 components. (R. 136 Ex. 7 (SCD Supplement) ¶ 6.5.1.h.(3).)

This analysis is slightly confused. The specifications to which Crane allegedly did not conform here are testing specifications, rather than vent hole placement specifications. When a plaintiff alleges defects in how a product was tested, and the testing was governed by government specifications, the defendant may raise the *Boyle* defense for the testing on the same terms as it could for the product itself. *In re Aircraft Crash Litig. Frederick, Md.,* 752 F.Supp. 1326, 1337 (S.D.Ohio 1990). Thus, a military contractor may avoid liability for defective testing if it can show (1) that the United States provided reasonably precise specifications for the testing; (2) that the testing conformed to those specifications; and (3) that the supplier warned the United States about any dangers in the use of the testing that were known to the supplier but not to the United States. *Boyle,* 487 U.S. at 512, 108 S.Ct. 2510. I may now examine plaintiffs' individual arguments about Crane's testing, each of which focuses on showing that Crane did not conform to the government's testing specifications.

First, and crucially, plaintiffs contend that the version of the pump which Crane tested did not have a vent hole at the site where they allege that the KC–135R's pump emitted molten metal: the upper vent hole was added later. Crane's detail drawing of the RR12280 pump's end bell housing, RG21604, shows a 1/32" diameter hole at the top of the end bell, labeled "B3"; the drawing's revision history indicates that Revision B3, "added 1/32 dia. hole," was added to the drawing on June 29, 1961—more than three weeks after the June 5 explosion proof testing on the RR12280.

In addition, Boeing's SCD required a spark plug to be placed within 1/4" of every vent, drain, and other outlet "normally open to the tank." (R. 136 Ex. 4 (SCD 10–30322) ¶ 4.2.25.2.) The test report's schematic drawing of the June 5, 1961 test setup describes spark plugs 2, 3, and 4 as being, respectively, 1/4" from each of three specific vent holes—the left top motor vent hole, the center top motor vent hole, and the right top motor vent hole—and makes no reference either to a recently-added upper vent hole or to a spark plug at that location. (R. 136 Ex. 33 (TR–996) at 27A.) [14] There is thus strong circumstantial evidence that the version of the pump that was explosion proof tested did not have an upper vent hole.

Crane replies that during the relevant period, it was free to change the pump's design as it wished, and thus might have added the vent hole not only before the detail drawing was updated to reflect the new vent hole, on June 29, 1961, but also before the June 5, 1961 explosion proof testing. (R. 116 at 18.) As evidence that it actually did add the vent hole before the explosion proof testing, Crane offers a competing interpretation of the schematic drawing. (*Id.* at 19.) [15] The schematic drawing indicates that spark plug 5 was placed 1/4" from the "motor lead exit hole." (R. 136 Ex. 33 (TR–996) at 27A.) The lab records refer to this spark plug as being placed at the "lead wire boss." (R. 136 Ex. 33 (TR–996) at Exp. Test no. 813–1.) I understand both phrases to refer to the feed-through terminal at the top of the pump, through which the motor lead wires exited the pump into the supplying cable assembly. Crane contends that because the upper vent hole is the only hole "normally open to the tank" in the vicinity, the

---

**14.** I reject Crane's contention that "Plaintiffs [sic] allegation of non-conformance in this area is completely unsupported by the facts." (R. 116 at 10.)

**15.** Although suppliers for the B–52 were required to provide a photograph of any explosion proof testing, taken while the test was in operation (R. 136 Ex. 7 (SCD Supplement)

¶ 6.5.1.h.(3)), I have been unable to identify a photograph showing the RR12280's explosion proof testing in the relevant Qualification Test Reports. (R. 89 Exs. 34 (TR–1307), 37 (*intended to be* Ex. 18) (TR–996).) Thus, the schematic drawing and the contemporaneous lab records are the only evidence before me of how the testing was done.

SCD's requirements prove that Crane must have placed spark plug 5 by the upper vent hole, and not by the "motor lead exit hole" or "lead wire boss."

This argument assumes that which it seeks to prove. Specifically, it assumes that there was an upper vent hole when the schematic was drawn. From that assumption, it concludes that the schematic's clear language must, by reference to another document (which goes uncited), actually refer to the assumed upper vent hole and not refer to what it says, the motor lead exit hole. Unless an upper vent hole is assumed from the start, this argument fails.

In addition, this interpretation of the schematic ignores the context. As already noted, the schematic describes spark plugs 2, 3, and 4 as being a certain distance from each of three identified vent holes. If the schematic proves, as Crane contends, that spark plug 5 were the same distance from a recently-added upper vent hole, its next line would naturally describe the spark plug as "1/4" from upper vent hole," and not what it says, "1/4" from motor lead exit hole." Crane's reading of the schematic is forced and unnatural. I find that its speculations do not satisfy its burden to "*demonstrate* the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (emphasis added).

Plaintiffs' second objection to how the explosion proof testing was conducted concerns whether the pump was running during the test. No fewer than three portions of the relevant military specification required this. The explosion proof testing was to be done on an operating pump, in part, to ascertain that the pump functioned properly (R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23.2.(a)); the test apparatus was to include a power source to run the pump (*id.* ¶ 4.5.23.1.(b)(2)); and, for each air-fuel mixture, the pump was to be operated at its rated load for fifteen minutes during testing, except during charging (*id.* ¶ 4.5.23.2.(e)(2)).

Crane's schematic drawing for the test does not show any cables or power source to run the pump during the test, although, by contrast, it does show wiring to run the spark plugs for the test. (R. 136 Ex. 33 (TR–996) at 27A.) Moreover, the lab records are silent as to whether the pump was run during the tests. (*Id.* at Exp. Test no. 813–1.) The military specifications indicate that after the pump was tested while running for each air-fuel mixture, the pump was to be turned off so it could be refilled with an explosive mixture, which was then to be exploded by a spark plug.[16] The lab reports record only one set of notes on the actual running of the test: between changes in air-fuel mixture, heaters were turned on to bring the test chamber's heat up to the specified level. (R. 136 Ex. 33 (TR–996) at Exp. Test no. 813–1.) It is therefore not an unreasonable inference that if the pump had been running while a given air-fuel mixture was tested, and was then (1) turned off and (2) re-filled with an explosive mixture (3) which was exploded before (4) the test chamber's heaters were turned on to prepare for testing the next air-fuel mixture, the lab report would describe all of this,

---

**16.** The full text of the relevant procedure is as follows:

> The unit under test shall be operated, except during charging, at rated load for a period of 15 minutes. During this period, the explosive mixture in the unit shall be exploded (either by normal arcing within the unit, or by means of a spark plug inserted in the unit for that purpose) and refilled with an explosive mixture for a total of three explosions. Immediately after the 15–minute period, *the unit not operating shall be* again refilled with an explosive

> mixture which shall be exploded by means of the spark plug. After this test, the chamber spark plug shall be fired to determine that an explosive mixture existed during the test period.

R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23.2.(e)(2) (emphasis added). I read the emphasized phrase as "the unit, not operating, shall be ..." because only one pump was to be subjected to explosion proof testing. (*Id.* ¶ 4.2.2.) There were therefore not two units, one operating and one not operating.

and not just (4) turning on the heaters. I infer in plaintiffs' favor as the non-moving parties that the pump was not operating during the testing.

Crane appears to concede that the pump may not have been operated during explosion proof testing, but contends that Boeing's SCD implicitly relieved it of the requirement. (R. 116 at 8.) Boeing's SCD specified that it governed where it "specifically superceded" the military specifications. (R. 136 Ex. 4 (SCD 10–30322) ¶ 3.1.2.1.) The SCD required that the pump's temperature not exceed 390F̄, and required that it have a temperature limiting device that would disconnect the pump's power if its temperature exceeded the maximum allowed. (*Id.* ¶¶ 3.1.2.17–18.) The SCD's specifications for the explosion proof testing required that:

> The explosion proof test shall be conducted in accordance with MIL–P–5238, paragraph 4.5.23.1, except as follows: ... The test chamber ambient shall be 160 ± 5°F. The motor case temperature shall be raised to 400 ± 10°F. The unit shall be soaked under these temperatures for a minimum of one hour prior to the explosion proof tests.

(*Id.* ¶¶ 4.2.25, 4.2.25.1.) The military specifications required that the test chamber in which the pump was placed for the test was to be no higher than 135°F. (R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23.2.(d).)[17] Crane argues that, due to the SCD's requirement that a temperature limiting device render the pump inoperable at temperatures over 390°F, the SCD superceded the military specification's requirement

that the pump be operated during the explosion proof tests. (R. 116 at 8.)

This argument fails. The SCD twice specified that the military specification governed the SCD, unless, in one version, the SCD "specifically superceded" the military requirements (R. 136 Ex. 4 (SCD 10–30322) ¶ 3.1.2.1), and, in the other version, "except as follows" (*id.* ¶ 4.2.25). The SCD does not specifically supersede the military specification's requirement that the pump be operated during explosion proof testing anywhere, including ¶ 4.2.25. In addition, the SCD explicitly details several specific divergences from the military requirements for other aspects of the explosion proof testing, which indicates that Boeing was quite able to specifically supersede the military requirements when it wished to. Moreover, it is noteworthy that these other divergences—for example, requiring that the test chamber's ambient temperature be 165°F rather than under 135°F, and that the test be conducted with a spark plug near every vent, drain, and other opening, rather than with only one spark plug for the entire pump[18]—all made the testing more stringent than the military's requirements, not less. Especially because one purpose of the government's specifications for explosion proof testing was to ensure that the pump functioned properly while operating (R. 112 Ex. 14 (MIL–P–5238A) ¶ 4.5.23.2.(a)), it seems highly unlikely that, if the SCD required the testing to be done on a non-operating pump, it would imply that through silence, rather than by specifically superseding the military requirement.[19]

17. I have not found a specification in the military requirements for a maximum allowable temperature for the pump while operating; or for a temperature limiting device to ensure that the pump did not exceed the maximum allowable temperature; or for the maximum temperature of the pump's motor case during explosion proof testing.

18. *Compare* R. 136 Ex. 4 (SCD 10–30332) ¶ 4.2.25.2 (requiring one spark plug for every vent, hole, or outlet) *with* R. 112 Ex. 14 (MIL–P–5238A) ¶¶ 4.5.23.1.(a)(5), 23.2.(e)(1) (re-

quiring one spark plug for entire pump). *See also* R. 116 Ex. 1 (Cygnor Dep. 9/9/98) at 63 (plaintiff's expert agreeing, under questioning from Crane's counsel, that where the SCD varied from the military specifications, it was more rigorous).

19. Indeed, because the SCD allowed a margin of ± 10F̄ from the specified 400F̄ for the explosion proof testing, it might have been possible to operate the pump at 390F̄ and thereby to satisfy both the maximum temperature and temperature limiting requirements of

Further, the *Boyle* defense requires the contractor to prove that it conformed to the *government*'s specifications. *Boyle,* 487 U.S. at 512, 108 S.Ct. 2510. Here, those specifications undisputedly required the pump to be operated during explosion proof testing. Even if, for the sake of argument, Boeing's SCD specifically superseded those government specifications, Crane has not shown that Boeing had any governmental authority to reduce the rigor of the government's specifications, or that Boeing's doing so would constitute an exercise of uniquely *governmental* discretion in balancing technical, military, social and safety trade-offs. *Boyle,* 487 U.S. at 511, 108 S.Ct. 2510. Crane has thus not shown, for purposes of summary judgment, that it conducted this aspect of its explosion proof testing in conformity with the government's specifications. The government contractor defense does not protect it from any attendant liability.

Third, plaintiffs contend that, because it was not witnessed by a government observer, the explosion proof testing on the RR12280 was defective as applied to Crane's later contract to supply RR12280A pumps. In a June, 1964 letter, the Air Force required that all qualification testing for the RR12280A pump be witnessed by a government inspector. (R. 89 Ex. 26 ¶ 2.) Crane submitted "qualification by similarity" data, including lab records, from the RR12280's June 5, 1961 explosion proof testing to demonstrate that the RR12280A pump met the Air Force's specifications. (R. 89 Ex. 34 (TR–1307) ¶ 6.4.) All three pages of the lab records have no initials on the line for "observer." (R. 136 Ex. 33

(TR–996) at Exp. Test no. 813–1). Indeed, Crane identifies forty pages of lab records for *other* tests which government observers *did* initial. (R. 88 at 15 & n. 9, 29 & n. 18.) The presence of those initials strengthens the inference that government observers did not witness the explosion proof testing; and all inferences must be drawn in favor of plaintiffs as the non-moving parties.

Crane replies first that the Air Force requirement that a government inspector witness all qualification tests was provided in only "a single [and] solitary letter" (R. 116 at 19), and therefore was not "reasonably precise" within the meaning of *Boyle.* The letter reads: "In addition to the above requirements, qualification tests are mandatory before the pumps will be acceptable to the Air Force. The tests are to be performed at your plant or an approved testing laboratory witnessed by a Government inspector." (R. 89 Ex. 26.) I am unable to determine in what relevant way this specification is imprecise, or how repetition would make it more precise. Crane's second reply is that the front pages of two different qualification test reports (one each for the RR12280 and RR12280A) were signed as having been "coordinated by" government officials— and that each report included the lab reports of the apparently unwitnessed explosion proof testing. (R. 89 Exs. 34 (TR 1307), 37 (*intended to be* Ex. 18) (TR 996).) Those signatures plainly do not establish that a government inspector witnessed the explosion proof testing.

Crane has thus failed to demonstrate, for summary judgment purposes, that the

---

¶¶ 3.1.2.17–18 (390°F) and the explosion proof testing temperature requirements of ¶ 3.1.2.25.1 (400°F ± 10°F).

Even if this would not have been possible, the practice among the relevant parties during the period was for suppliers to request clarification and negotiate details of the qualification testing process. This is evidenced by Crane and Boeing's extensive correspondence in 1963 and 1964 regarding Crane's never-completed qualification testing to win Boeing

"Tentative Approval" for the RR12280A pump (*see, e.g.,* R. 136 Ex. 24; R. 89 Exs. 20–24) and with the Air Force in 1964 regarding qualification testing for the same pump (*see* R. 89 Exs. 26, 29–33). Crane has not submitted any correspondence indicating that it sought or received confirmation from Boeing or the Air Force that it need not operate the RR12280 pump during its 1961 explosion proof qualification testing.

government contractor defense renders it immune from its liability, if any, stemming from the defects alleged in its explosion proof testing.

### c. Teflon insulation

■ The red motor wire lead which melted has Teflon insulation along two inches of its length. Plaintiffs assert that Crane's failure to provide Teflon insulation along the entire length was negligent; Crane argues that it is protected by the government contractor defense.

The parties agree that the detail drawing of the pump's stator (R. 89 Ex. 39) shows a two-inch Teflon insulation sleeve on each motor wire lead, and that, by contrast, the assembly drawing shows Teflon insulation over the entire length. (R. 111 ¶ 74; R. 116 at 22–23.) Plaintiffs point to this disparity as evidence that there was no "reasonably precise" specification under *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510. (R. 110 at 23.) Crane replies that according to engineering convention, detail drawings prevail if they conflict with an assembly drawing, and so the detail drawing showing two inches' worth of Teflon insulation constitutes a "reasonably precise" specification. (R. 116 at 23.)

I need not resolve this dispute. Even if the drawings, taken as a whole, do constitute a "reasonably precise" specification for Teflon insulation to cover only two inches of each motor lead wire, there is still no evidence that a government official considered this design feature and, after substantive and meaningful review, approved it in an exercise of discretion balancing technical, military, social and safety trade-offs. *Boyle*, 487 U.S. at 511–12, 108 S.Ct. 2510. Crane identifies as its only evidence the two earlier arguments from silence: The detail drawing of the stator was among those sent to the Air Force before it approved the pump as a whole; and the Air Force would necessarily have seen that there were only two inches of Teflon insulation on each motor lead wire in the February 28 and March 1, 1963

tear-down inspection. (R. 116 at 23.) These arguments have been considered and rejected.

### d. Aluminum casting quality

■ Plaintiffs allege that the pump's housing was made from a defective class of aluminum casting. Crane argues that even if it had used a defective class—which it does not concede—the government approved Crane's using that class and so Crane is protected by the government contractor defense.

The best aeronautical castings, Class I, are those "the single failure of which during any operating condition would cause loss of the aircraft or one of its major components, loss of control, unintentional release of or inability to release any armament store, failure of gun installation components, or which may cause [s]ignificant injury to occupants of the aircraft." (R. 89 Ex. 18 (*intended to be* Ex. 37) (MIL–C–6021D) ¶ 3.1.1.) All other castings are Class II. (*id.* ¶ 3.1.2.) Crane's detail drawing specified using the lowest grade, Class IIB, for casting the end bell housing, and cited this military specification. (R. 89 Ex. 2 at n. 3.)

The other materials that the parties have brought forward do not establish government approval within the meaning of *Boyle* for any particular casting quality. The only relevant specification in the military requirements governing fuel booster pumps is that "Castings shall be of high quality, clean, sound, and free from blowholes, porosity, cracks, and any other defects." (R. 112 Ex. 14 (MIL–P–5238A) ¶ 3.4.2.) If taken literally, the portion of this specification requiring *no* porosity, rather than that porosity be limited to some specified degree, would mean, under the detailed military specification specifically addressing casting classes, MIL–C–6021D, that the casting for fuel booster pumps had to be the very highest class available, Class IA. This would be a very odd way for the fuel booster pump specifi-

cation to announce such a requirement, given the clearer option of citing MIL–C–6021D and specifying Class IA. Especially given the accompanying general language specifying high quality, sound construction, and no defects, this is, as Crane urges (R. 116 at 7), only a precatory admonishment. It represents only "the hopes of participants that the project on which they are about to embark will turn out well. General qualitative specifications must be distinguished from the 'detailed, precise and typically quantitative specifications for manufacture of a particular military product.'" *Kleemann*, 890 F.2d at 703 (*quoting Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 745 (11th Cir.1985)). This specification is not "reasonably precise." *Boyle*, 487 U.S. at 512, 108 S.Ct. 2510.

■ The only relevant specification in Boeing's SCD reads, in full: "Castings shall conform to MIL–C–6021D, as defined on the applicable supplier drawings. The grade and class selected shall be suitable for the intended application. No casting shall be used that has imperfections on sealing or bearing surfaces." (R. 136 Ex. 4 (SCD 10–30322) ¶ 3.1.3.6.) On a similar analysis, a requirement that a supplier use a grade and class "suitable for the intended application" is not "reasonably precise."

Crane has offered no evidence that a government official ever considered and, after substantive and meaningful review, approved its detail drawing's specification calling for Class IIB casting. Rather, the issue was apparently never discussed. Crane simply relies on the argument from silence, which was rejected above.

■ However, the government's classification scheme in MIL–C–6021D for the use of different castings is sufficiently substantial to imbue reasonable precision upon at least some specifications. Crane may satisfy its burden if it establishes that this government specification fully justified using a Class IIB casting for this pump. The question is thus whether failure of an auxiliary booster pump's casting would be considered, a priori, liable to cause loss of an aircraft, one of its major components, or another loss that MIL–C–6021D identifies as requiring the use of a Class I casting.

Crane has not submitted evidence for me to reach a considered conclusion on this question. Plaintiffs, for their part, have submitted an expert's declaration that the pump performs "critical functions [which] subject the pump to a high level of mechanical stress." (R. 112 Ex. A ¶ 20.) Crane contends that the pump at issue did not bear a high stress load. (R. 116 at 7.) But the evidence on which Crane relies was not included in the relevant exhibit. (R. 116 Ex. L was to include Kumar Dep. 9/11/98 at 86–87 and 91; it jumps from 86 to 110.) Even if there were evidence to support Crane's claim, there would be a material factual dispute about the stresses to which this pump was subjected. Crane has not established, to a degree that all rational jurors must agree, that loss of the pump's casting would not be considered, a priori, a loss requiring the use of a Class I casting. Accordingly, I find that it has not met its burden to establish a *Boyle* defense.

### e. Defective wire allegations

■ Plaintiffs contend that Crane's design and manufacture of the motor lead wires in the pump involved in the explosion was defective because it was seven-strand, rather than nineteen-strand; and because it was 600–volt type "E" wire rather than 1000–volt type "EE" wire. Crane does not dispute that the wire is seven-strand 600–volt type "E" wire, but argues that it is protected by the government contractor defense.

Crane plainly did not conform to its own specifications for wire quality, and there is no evidence that the government approved a lesser standard as of the time of manufacture. Crane's detail drawings of the pump's stator at the time of manufacture (R. 89 Ex. 39 rev. F) required the motor lead wires to be of 18–gauge wire made in

conformity with drawing RB21608, which, in turn, specified nineteen strands and type "EE" construction for 18–gauge wire (R. 89 Ex. 40 (drawing RB21608) & n. 1). The government specifications for fuel booster pumps are silent regarding the composition of motor lead wires. (R. 112 Ex. 14 ¶ 3.5.3.3.) Boeing's SCD requires that the motor lead wires be of type "EE" and of at least 18–gauge construction as per the military specification for insulated wire, MIL–W–16878. (R. 136 Ex. 4 ¶ 3.1.2.21.) One of Crane's experts, Thomas Sailer, testifies that this specification "called for a minimum of 7 strands in 18–gauge wire." (R. 89 Ex. A ¶ 8.) However, Sailer does not cite a particular portion of the military specification to support Crane's suggestion that seven strands were sufficient. As I read it, the military specification contemplated four different types of 18–gauge wire, with any of one, seven, sixteen, or nineteen strands; nineteen strands was the "Preferred stranding for the associated [gauge] size." (R. 112 Ex. 15 at tbl. I & n. 2.) Thus, I find that Crane has not established that, after considered and substantive review, the government approved Crane's using lower-quality 18–gauge wire than Crane's own specifications required, namely, type "EE" 1000–volt nineteen-strand wire.

■ Crane's remaining argument is that more than a decade after it made the pump, the government authorized it to use type "E" 600–volt seven-strand 18–gauge wire. In 1976, Crane submitted an Engineering Change Proposal (ECP) to the Air Force which, among twenty-eight proposed changes, would have this effect. (R. 89 Ex. 43 (referring to R. 89 Ex. 44).) The Air Force wrote to Crane that the ECP was approved. (R. 89 Ex. 45.)

But Crane has not submitted any evidence suggesting that the Air Force's approval of the ECP was based on a substantive and meaningful review of its twenty-eight proposed changes. The ECP itself suggests that the changes are innocuous; it states that the "reason for change" is simply to "remove obsolete mat[eria]l [and] update to new standards." (R. 89 Ex. 43.) Crane has provided no evidence that the Air Force's approval of the less demanding standards was anything more substantive than a rubber-stamping.

■ Even if there were evidence that the Air Force's approval of the ECP followed a substantive and meaningful review, subsequent government approval of less rigorous standards cannot trigger the government contractor defense. The defense is intended to protect contractors from "civil liabilities arising out of the performance of federal procurement contracts," *Boyle*, 487 U.S. at 506, 108 S.Ct. 2510, and not from liabilities arising out of the breach of such contracts. The defense displaces state law "only where ... a significant conflict exists between an identifiable federal policy or interest and the operation of state law." *Id.* at 507, 108 S.Ct. 2510 (internal quotation marks, citations, and brackets omitted). Where state tort law and the federal interest in obtaining goods ordered as specified would both require the contractor to fulfill the terms of its contract, there is no conflict, nor does Crane suggest otherwise in its briefs. "The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be preempted in this context." *Id.* at 509, 108 S.Ct. 2510. Federal policies are not advanced by shielding a party which breached a federal contract from its attendant liability under state law.

### f. Routing of the motor lead wires

■ Plaintiffs allege that the routing of the motor lead wires was defective in ways which put unnecessary stresses on them and which, cumulatively, weakened their insulation: the wires were put through a 90–degree turn at the neck of the end bell housing; they were tightly bundled together; they were twisted in two pairs of two, rather than loosely twisted as a foursome; and they were stuffed into too small a

volume in the feed-through terminal. (R. 112 Ex. A ¶¶ 28–33.)

Crane replies that it is protected by the government contractor defense. It is undisputed that the wires exit the stator in the manner shown on Crane's detail drawing of the stator. (R. 110 at 14; R. 111 ¶ 81; R. 116 at 24.) The assembly drawing for the pump as a whole, drawing RR12280A, clearly shows that the motor lead wires are put through a 90˜turn. Moreover, Boeing's largely empty sketch of the interior of the pump shows such a 90˜turn as an "optional routing for wire leads." (R. 136 Ex. 4 (SCD 10–30322) at 13.) [20] Crane contends that the government approved the wires' routing because it did not say otherwise when it had the opportunity to do so. (R. 116 at 24.) This is the argument from silence considered and rejected above, and is not require further discussion.

Largely because of *Boyle*'s difficult evidentiary standards, Crane has failed to establish that the government approved any of the design features in question after substantive review and in an exercise of governmental discretion balancing technical, military, social and safety considerations. *See Boyle*, 487 U.S. at 511–12, 108 S.Ct. 2510. Crane's motion for summary judgment thus fails.

## VI. BOEING'S SUMMARY JUDGMENT MOTION

Boeing has moved for summary judgment on the more traditional grounds that plaintiffs have fallen short of their evidentiary burdens on one or more necessary elements of each of their legal claims.

Plaintiffs did not respond to Boeing's arguments on strict liability or breach of warranty, so I address those claims briefly before turning to negligence. I apply Wisconsin law on all three claims. In diversity cases, a district court is to apply the substantive law which would be applied by the state in which it sits, here, Wisconsin. *Erie R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This in turn requires determining which law Wisconsin would apply. Because no party has identified any conflicts between Wisconsin law and the law of any other relevant state, Wisconsin law applies as the law of the forum. *Hunker v. Royal Indem. Co.*, 57 Wis.2d 588, 598–99, 204 N.W.2d 897 (1973).

### A. Strict Liability

Boeing argues that it is not liable under strict product liability because it did not manufacture or place into the stream of commerce the pump involved in the explosion. The leading case is *Dippel v. Sciano*, 37 Wis.2d 443, 460, 155 N.W.2d 55 (1967), which refers to a "seller." Although *Dippel*'s implied requirement of a "sale" has been relaxed in at least two instances,[21] Wisconsin does not apply strict liability to defendants who did not place a product into the stream of commerce and were not links in the chain of commercial distribution. *See, e.g., Rolph v. EBI Cos.*, 159 Wis.2d 518, 528–30, 464 N.W.2d 667 (1991) (finding that as a matter of law a reconditioner of machinery was not strictly liable for unreasonably dangerous defects in a machine it reconditioned). Here, it is undisputed that the pump was never in Boeing's possession or control, and that

20. Interestingly, Boeing revised the SCD to allow this optional routing only as of May, 1963, even though it had granted the RR12280 pump, with identical routing, Final Approval five months before. (R. 136 Ex. 4 at 2.3, rev. N.) The expert who declared that the 90˜turn is a safety defect, John E. Cygnor, may not have realized that the Boeing SCD specifically approved it as an optional routing; he testified in his deposition that he had no criticisms of the SCD. (R. 161 Ex. A (Cygnor Dep. 9/10/98) vol. II at 272.)

21. Strict liability may lie where a defendant in the business of selling a product places it in the stream of commerce by supplying it to a customer without a sale, *Mulhern v. Outboard Marine Corp.*, 146 Wis.2d 604, 612–14, 432 N.W.2d 130 (Ct.App.1988), or where a commercial lessor leases a product in defective and unreasonably dangerous condition, *Kemp v. Miller*, 154 Wis.2d 538, 556–57, 453 N.W.2d 872 (1990).

Boeing did not place it into the stream of commerce. Accordingly, plaintiffs' claim of strict liability against Boeing fails.

## B. Breach of Warranty

█ Wisconsin has adopted the Uniform Commercial Code, which allows certain breach of warranty actions against a merchant-seller of goods. Wis.Stat.Ann. §§ 402.314, .315 (West 1995). As discussed above, Boeing did not sell the pump, and thus cannot be held liable for breach of warranty.

## C. Negligence

Plaintiffs allege that Boeing was negligent in granting Design Proposal Approval to the RR12280A pump. Boeing's involvement may be summarized as follows. In 1960, it issued a request for proposals for booster pumps to install in two models of the B–52 aircraft. These pumps were to be built according to the specifications in Boeing's SCD 10–30322; the SCD itself incorporated the military specification for booster pumps, MIL–P–5238A. In December, 1960, Crane proposed its RR12280 pump as original B–52 equipment and, in September, 1961, Boeing granted Design Proposal Approval.[22] In April, 1962, Boeing scheduled and performed an Equipment Quality Analysis on the RR12280 pump, and invited Crane to attend. (R. 146 Exs. 10–12.)

After receiving Crane's Qualification Testing Report, Boeing granted the pump Tentative Approval in June 1962, and then, with Air Force approval, granted it Final Approval in December, 1962. Following the tear-down inspection of February 28 and March 1, 1963, which found stator phase insulation problems, Boeing issued a No Further Procurement order in March, 1963, citing "premature motor failure." (R. 136 Ex. 4 (SCD 10–30322) at 2.3, rev. M.)

Two months later, in May, 1963, Crane submitted plans for the RR12280A to Boeing for use as original equipment on the B–52. Boeing responded the next month with a letter headed, "Data required for design proposal approval," which requested detail drawings for all motor parts and the phase insulation, as well as for the straight adapter, mounting plates, and by-pass valve (R. 89 Ex. 7); Crane provided them in June or July, 1963 (R. 89 Ex. 13). In July, 1963, Boeing requested, among other drawings, the detail drawing of the stator—the drawing which Crane and plaintiffs agree shows only two inches of Teflon insulation, and which Crane contends shows the routing of the motor lead wires through the pump—and Crane provided it in August, 1963. (*Id.* at 2 (referring to drawing RG21605–1).)

In December, 1963, Boeing granted Design Proposal Approval to the RR12280A pump. Two days later, the Air Force reported the rotor shaft breakage problem on the RR12280. Five months later, in May, 1964, Crane proposed the RR12280A pump to the Air Force in response to the Air Force's request for proposals for B–52 replacement pumps. Crane specifically noted that "these pumps have received Design Proposal Approval from the Boeing Company." (R. 89 Ex. 25.) Crane also wrote, "If our bid is accepted for procurement, we will obtain full approval from Boeing . . . prior to shipment of hardware to the Air Force." (*Id.*) Despite correspondence between Crane and Boeing through 1965 and beyond about the qualification testing process for the RR12280A pump, Crane never received Tentative or

---

**22.** Boeing suppliers needed three different approvals to have their products installed as original equipment on Boeing aircraft. If the supplier's design proposal met the SCD's specifications, it would receive "design proposal approval," which Boeing cautioned "shall in no way be construed as approval or acceptance of the supplier's detailed design or manufactured article." (R. 136 Ex. 7 (SCD Supplement) ¶ 6.2.1.) After Boeing received and approved all required drawings and test results and approved the product for installation and flight operations, the product received "tentative approval." (*Id.* ¶ 6.2.4.) Once Boeing's customer approved the article, "final approval" was granted. (*Id.* ¶ 6.2.5.b.)

Final Approval from Boeing. The Air Force's initial August, 1964 sales order called for Crane to send three sets of the detail drawings for the RR12280A to Boeing; in November, 1964, the Air Force revised the sales order to cancel that requirement.

Against this history, I may now turn to plaintiffs' allegations that Boeing breached a duty of care. Plaintiffs identify three categories of specifications in Boeing's General Requirement Supplement to Source Control Drawings for Model B–52 ("SCD Supplement") that they assert Boeing violated when it granted Design Proposal Approval: requirements for qualification by similarity (of the RR12280A to its predecessor, the RR12280); for Equipment Quality Analysis; and for maintainability.

### 1. Approval of qualification testing by similarity

First, plaintiffs allege that Boeing wrongly did not force Crane to explosion proof test the RR12280A, but instead allowed Crane to qualify it by its similarity to its predecessor, the RR12280. The SCD Supplement allows Boeing to approve a supplier's qualifying a product on a particular qualification test on the basis of its similarity to previously qualified products. (R. 136 Ex. 7 (SCD Supplement) ¶ 6.5.3.) In March, 1964, Crane requested Boeing's permission to qualify the RR12280A and RR12220A pumps on explosion proof testing based on "similarity to the older designs, the RR12220 or the RR12280 which were qualified as reported." (R. 149 Ex. 18.) This letter cited Crane's Qualification Test Report for the RR12280 pump, TR–996 (R. 89 Ex. 37 (*intended to be* Ex. 18)). Boeing already had a copy of the detail drawing for the end bell housing, drawing RG21604, as of January, 1964 (R. 149 Ex. 17), and that drawing's revision history

indicated that the crucial upper vent hole was added on June 29, 1961. Had Boeing taken the trouble to look, plaintiffs contend, it would have realized that the first page of lab reports for the explosion proof testing enclosed in TR–996 was dated June 5, 1961, more than three weeks before the revision date shown on drawing RG21604. On that basis, plaintiffs urge that Boeing should never have allowed explosion proof testing by similarity for the RR12280A. (R. 144 at 18–19.)

This argument misconceives Boeing's responsibilities in approving qualification testing by similarity. Suppliers were obliged to assign a new part number when implementing any changes to a design under proposal and to use the new part number in all drawings. (R. 136 Ex. 7 (SCD Supplement) ¶ 6.4.6.) Thus, if Crane had indeed changed the design of the end bell housing between conducting the explosion proof testing and revising its drawing, the onus was on Crane to notify Boeing of the design change, by assigning a new number to drawing RG21604.[23] Boeing's responsibilities under the qualification by similarity portion of the SCD Supplement simply charged it with assessing whether the article for which qualification by similarity was sought was sufficiently similar to a previously qualified article. (*Id.* ¶ 6.5.3.) Thus, Boeing's responsibility was limited to assessing whether the RR12280A and RR12280 shared the same (or a similar) housing and that there was sufficient evidence that the RR12280 had passed explosion proof testing. Boeing satisfied its responsibility by confirming that the proposed RR12280A used the same detail drawing, RG21604, for its housing, and that the RR12280 had passed explosion proof testing. Boeing was not required to revisit the quality of Crane's 1961 explosion proof testing on the

---

**23.** It is noteworthy that, if plaintiffs' theory about the sequence of events in June, 1961 is accurate, Crane's complying with this requirement would have immediately made clear the defect in the explosion proof testing.

A pump which passed explosion proof testing with end bell housing RG21604 in June, 1961 would not have later received Tentative or Final Approval with a differently-numbered end bell housing.

RR12280, or to audit Crane's detail drawings to ensure that Crane had renumbered its drawings to reflect any revisions. Boeing thus did not violate its responsibilities under the SCD Supplement's qualification by similarity requirements.

## 2. Equipment Quality Analysis

Second, plaintiffs contend that Boeing failed properly to adhere to its own specifications for conducting Equipment Quality Analyses. The SCD Supplement included this specification: "Boeing will, at its own discretion at some time in the life of any purchase contract, completely dismantle randomly selected articles for Equipment Quality Analysis (EQA) purposes. The supplier will be invited to attend such evaluation and to cooperate in establishing corrective action for all discrepancies encountered." (R. 136 Ex. 7 ¶ 4.1.5.) Plaintiffs contend that Boeing violated this requirement because its April, 1962 EQA of the RR12280 pump failed to identify two discrepancies between Crane's assembly drawing and stator drawing. One discrepancy regarded how much of the motor lead wires was to be covered with Teflon insulation; the other regarded the routing of the motor lead wires. (R. 144 at 12–15 (citing R. 149 Ex. A ¶¶ 23–25).)

 Boeing initially suggests that consideration of this issue may be barred because none of plaintiffs' experts, including the expert on whose declaration plaintiffs rely in their response brief, John E. Cygnor, disclosed this theory in their mandatory expert disclosures. (R. 158 at 8.)[24] Under the rules governing discovery, all parties are required to submit a written report from each expert which includes "a statement of all opinions to be expressed and the basis and reasons therefor." Local Rule § 7.07(d)(1). This rule is substantially similar to Fed.R.Civ.P. 26(a)(2)(B). *See Metal Processing Co. v. Amoco Oil Co.*, 173 F.R.D. 244, 247 (E.D. Wis. 1997)

(Gordon, J.). The federal rules provide a duty of continuing disclosure which is heightened for expert reports. See Fed. R. Civ. P. 26(e)(1).

Plaintiffs' conduct regarding Cygnor's testimony appears to have fallen short of the required standards. A party that fails to disclose information required by Local Rule 7.07 or Federal Rule 26(a) may not use as evidence any witness or information not so disclosed, unless such failure is harmless. *See Metal Processing Co.*, 173 F.R.D. at 247–48 (citing Fed. R. Civ. P. 37(c)).

 Nonetheless, this sanction is not always mandatory. It is the district court's responsibility to select an appropriate sanction. *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 671 (7th Cir.1996). It appears to me that applying this sanction here would be too drastic. Cygnor's declaration is plaintiffs' sole evidence on the EQA issue. Thus, refusing to consider it would require granting Boeing's summary judgment motion with regard to this issue and dismissing this portion of plaintiffs' suit. Dismissal should be ordered only if it is "proportionate to the circumstances surrounding a party's failure to comply with discovery rules." *Salgado ex rel. Salgado v. General Motors Corp.*, 150 F.3d 735, 740 (7th Cir.1998) (quotation marks omitted) (quoting *Melendez*, 79 F.3d at 672). Options short of dismissal are available; Boeing could move to re-open discovery to depose Cygnor concerning the new theory, as well as to recover its reasonable expenses for doing so, including attorneys fees. Fed.R.Civ.P. 37(a)(2), (a)(4). In addition, as we will see, the late-offered theory is harmless.

In the first instance, it is harmless because the EQA requirement referring to "discrepancies" was added to the SCD Supplement only in January, 1963, eight months after Boeing performed the EQA.

---

**24.** Boeing has not formally requested me to bar plaintiffs' evidence on this issue—which would have the effect of entering judgment against plaintiffs on it—but has simply raised the issue for consideration.

(R. 136 Ex. 7 (SCD Supplement) at 2.) Boeing obviously could not violate a specification that had not yet been written.

█ Second, the notes taken from the EQA indicate that its purpose was to evaluate how well the specimen pump being examined conformed to the SCD specifications, rather than to audit the supplier's detail drawings for safety or other concerns. The notes cite as questions, for example, whether the specimen pump's "direction of rotation" marking was concealed by a mounting plate, contrary to a particular specification in the SCD, and whether a particular impeller was shimmed in conformity with dissimilar metal requirements. (R. 161 Ex. D ¶¶ 1–2.)[25] As the name suggests, the analysis is of equipment quality, rather than of design quality.[26] The SCD Supplement's later requirement that suppliers had the right to attend and to respond to "all discrepancies encountered" (R. 136 Ex. 7 ¶ 4.1.5) in an EQA referred to any discrepancies found between the manufacture of the specimen pump and the drawings, rather than discrepancies between the supplier's own detail and assembly drawings. Plaintiffs have provided no evidence suggesting that EQAs encompassed such drawing audits, and no evidence suggesting, even if they were, that Boeing fell short of the relevant duty of care. Consequently, Boeing must be granted summary judgment on this issue.

### 3. Maintainability

Plaintiffs' third assertion is that Boeing failed to enforce maintainability requirements in its SCD Supplement. The SCD Supplement required all design features to allow maintenance and repair as easily as possible, (R. 136 Ex. 7 ¶ 3.6), and be capable of being maintained "safely, effectively, and with minimum human error," (Id. ¶ 3.14.) In addition, it required suppliers to submit certain maintainability data and a maintainability plan. (Id. ¶ 6.4.5.)

Plaintiffs allege that the routing of motor lead wires through the pump and the lack of space in the end bell housing kept the motor lead wires from being pulled through the feed-through terminal, soldered and potted, and pushed back safely. In addition, they allege, Crane never provided Boeing with maintainability data or a maintainability plan which, they imply, would have revealed the design flaws. The relevant parts of the SCD Supplement were added by revision in January, 1963, months before Crane proposed the RR12280A and Boeing granted it Design Proposal Approval in December, 1963. Because Boeing granted Design Proposal Approval in the face of these defects, plaintiffs allege, Boeing breached a duty of care. (R. 144 at 4–6; R. 149 ¶¶ 26–32.)

### a. Preliminaries

█ Three of Boeing's preliminary replies merit discussion. First, Boeing contends that its Design Proposal Approval does not indicate approval of a supplier's detail drawings or design. The RR12280A never received any approval higher than Design Proposal Approval—including any approval which would have allowed the pump ever to be installed on any Boeing aircraft as original equipment. (R. 158 at 4–5). Boeing is correct about what Design Proposal Approval indicated; the SCD Supplement cautioned that Design Proposal Approval "shall in no way be construed

---

**25.** These notes were submitted with Boeing's reply brief, and thus initially appear analogous to the engineering conference notes Crane submitted with its reply brief, discussed above. However, I will consider Boeing's evidence here, because it is submitted in reply to a new matter that plaintiffs raised for the first time in their response. *Baugh,* 823 F.Supp. at 1456.

**26.** Indeed, plaintiffs acknowledge as much: "The purpose of an EQA inspection is to provide an opportunity for Boeing to dissemble [sic] and physically inspect the components of a vendor-supplied article, to compare the components to the vendor's detail drawings and insure that the components conform to the vendor's drawings for each particular component." (R. 145 ¶ 46.)

as approval or acceptance of the supplier's detailed design or manufactured article." (R. 136 Ex. 7 ¶ 6.2.1.) Nonetheless, Design Proposal Approval was not meaningless; to the contrary, it indicated that Boeing had found that "the proposed article will meet [SCD] requirements." (*Id.* ¶ 6.7.) Thus, Boeing can properly be held liable for any negligence in granting Design Proposal Approval.

Second, Boeing contends that the SCD Supplement's maintainability requirements imposed obligations solely upon suppliers, and not at all upon Boeing. (R. 158 at 7.) The relevant rules require that maintainability and human factors be "considered." (R. 136 Ex. 7 ¶¶ 3.6, 3.14.) To be sure, they do not specify which party is required to "consider" these criteria. But the posture of the parties—suppliers proposed articles that they believed met the SCD requirements, and Boeing either granted or denied Design Proposal Approval in light of the same requirements—discredits Boeing's suggestion that it was free, in evaluating a supplier's design proposal, wholly to disregard the criteria in its SCD Supplement. Boeing's task in evaluating a design proposal, after all, was to assess whether "the proposed article will meet [SCD] requirements." (*Id.* ¶ 6.7.) Boeing could hardly make that assessment by disregarding the requirements.

Third, Boeing concedes that it cannot prove, across the distance of more than thirty-five years, that it received the required maintainability data and plan from Crane before issuing Design Proposal Approval—but argues that plaintiffs cannot prove otherwise, and notes that plaintiffs bear the burden of proof, at least at trial. (R. 158 at 7–8.)

For summary judgment purposes, I am required to draw all reasonable inferences in plaintiffs' favor as the non-moving parties. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The parties have apparently been unable to find any direct evidence that Crane did (or did not) submit the required maintainability data and maintainability plan. There is thus no direct evidence that Boeing wrongly granted Crane's pump Design Proposal Approval in the absence of the maintainability information. Boeing accordingly suggests that plaintiffs have failed to meet their evidentiary burden. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548 ("[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.").

■■■ However, not all evidence is direct, and a non-moving party may overcome a summary judgment motion by supporting an element of its prima facie case solely with circumstantial evidence. *See, e.g., Pharma Bio, Inc. v. TNT Holland Motor Exp., Inc.*, 102 F.3d 914, 918 (7th Cir.1996). Here, the parties have submitted extensive evidence concerning many other facets of Crane and Boeing's interactions in 1963, with Boeing frequently requesting and Crane frequently forwarding documents and drawings. In the face of this extensive flow of inquiries, documents, and drawings, the absence of any mention whatsoever of Boeing's requesting or Crane's submitting maintainability data and a maintainability plan is sufficient circumstantial evidence to allow a reasonable jury to conclude that the maintainability data and maintainability plan were simply never sent. I draw the inference in plaintiffs' favor as the non-moving parties that Boeing issued its Design Proposal Approval without receiving the required maintainability data or maintainability plan.

#### b. Negligence elements

■■■■ I must thus determine whether plaintiffs have provided adequate evidence to support their prima facie burdens. Under Wisconsin law, a plaintiff asserting negligence must prove "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the

injury." *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 531, 247 N.W.2d 132 (1976).[27]

■ Plaintiffs' first burden is, accordingly, to provide evidence that Boeing had a duty of care. Boeing argues that its role was too attenuated for it to have any relevant duty of care. (R. 158 at 16–17.) But the cases it cites do not support its position. Where the United States Soil Conservation Service advised a landowner on constructing one component of an animal-waste system, there was no duty to oversee the safety of other components of the landowner's system, even though such systems admittedly required that each component be built in contemplation of the other components. *Hammann v. United States*, 24 F.3d 976 (7th Cir.1994) (applying Wisconsin law). Similarly, prior owners of a defective machine, not in the business of selling such machinery, were not liable for injuries the machine later caused because "neither . . . had the opportunity (or affirmative duty for that matter) to view the rotating drive shaft of the vertical boring mill in operation." *Geboy v. TRL Inc.*, 159 F.3d 993, 1000 (7th Cir.1998) (applying Wisconsin law). And the Wisconsin Supreme Court found that an equipment reconditioner had no duty to ensure that the equipment it reconditioned met current safety standards. *Rolph*, 159 Wis.2d at 537, 464 N.W.2d 667.

These cases should be distinguished. In contrast to *Hammann*, Boeing was not responsible for one component of a multi-component system; it made itself responsible for ensuring that, when a supplier proposed a B–52 component in response to Boeing's specifications, the proposal met the specifications, so far as could be told from the supplier's proposal and the detail drawings Boeing requested. If plaintiffs' allegations are accepted, Boeing had the opportunity and the self-imposed duty—both in contrast to the facts in *Geboy*—of reviewing the detail drawings of the stator that it had requested and of not granting Design Proposal Approval until it received and reviewed the required maintainability information, either of which (plaintiffs allege) would have revealed the pump's defects. In *Rolph*, the court found that the reconditioner had no duty to ensure that others' equipment on which it worked met current safety standards, because it had not held itself out as doing so. Here, Boeing explicitly did hold itself out as granting Design Proposal Approval only after making a finding that a proposed article would meet SCD requirements. The Wisconsin Supreme Court ruled that allowing the reconditioner to be held liable because it had worked on others' defective equipment "would shock the conscience of society because it would have no sensible or just stopping point." *Rolph*, 159 Wis.2d at 536, 464 N.W.2d 667. This is not such a case. To hold that Boeing had a duty would simply hold that a defendant may be liable for negligence if it fails to follow its own announced specifications.

■ Boeing argues that duty is inexorably intertwined with foreseeability, and that the explosion here was a fluke. (R. 158 at 17–18.) However, this misconceives the role of foreseeability analysis in Wisconsin tort law. So long as some loss to person or property is foreseeable from an act or omission, negligence is established. This is shown in the same case on which Boeing relies:

A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone. A party is negligent when he commits an act when some

---

27. Even when these elements are satisfied, the court may enter a finding of nonliability as a matter of public policy because (among other considerations) "the injury is too remote from the negligence or too wholly out of proportion to the culpability of the negligent tort-feasor, or in retrospect it appears too highly extraordinary that the negligence should have brought about the harm." *Rockweit v. Senecal*, 197 Wis.2d 409, 426, 541 N.W.2d 742 (1995) (quoting *Colla v. Mandella*, 1 Wis.2d 594, 598–99, 85 N.W.2d 345 (1957) (internal quotations and citations omitted)).

harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs.

*A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 484, 214 N.W.2d 764 (1974). Boeing's failure to follow its own maintainability requirements—if true—would make it foreseeable that, at a minimum, there was an unreasonable risk that the pump could be damaged during maintenance. *See also Shannon v. Shannon,* 150 Wis.2d 434, 444, 442 N.W.2d 25 (1989) (finding ordinary care not exercised where it was foreseeable that "such act or omission will subject ... the person *or property* of another[ ] to an unreasonable risk of injury or damage.") (emphasis added). Thus, Boeing's announced maintainability requirements imposed a duty of care. On that basis, Boeing is "liable for unforeseeable consequences [of breaching its duty of care] as well as foreseeable ones." *A.E. Inv. Corp.,* 62 Wis.2d at 484, 214 N.W.2d 764.

 Plaintiffs' second and third burdens under *Coffey,* 74 Wis.2d at 531, 247 N.W.2d 132, are to provide evidence that Boeing breached its duty of care and that this breach caused injury.[28] The causation standard in the Wisconsin courts is that a plaintiff must prove that the defendant's breach of duty was "a substantial factor in contributing to the result." *Merco Distrib. Corp. v. Commercial Police Alarm Co.,* 84 Wis.2d 455, 458, 267 N.W.2d 652 (1978). Thus, I must determine whether plaintiffs have provided sufficient evidence that Boeing did not enforce the SCD Supplement's maintainability requirements, and if so, that this failure was a "substantial factor" of the pump's eventual defective design.

The sole evidence on these two questions is the declaration of plaintiffs' expert, John E. Cygnor. The only defect he identifies with a plausible relation to maintenance is that soldering and potting the motor lead wires was difficult because of their routing and the cramped space inside the end bell housing—which are also, as it happens, among the defects that plaintiffs allege made the pump unreasonably dangerous. From this bare fact, Cygnor concludes, without providing any analysis or reasoning:

> 36. [The wire routing and cramped space in the end bell are] the result of Boeing's improper DPA approval of a pump that failed to meet the maintainability requirements of paragraphs 3.6 and 3.14 of Boeing SCD Supplement D3–2888.
>
> . . . .
>
> 39. [The wire routing and cramped space in the end bell] are also the result of Boeing's failure to require the manufacturer to provide the maintainability data and maintainability plan required by paragraphs 6.4.5 and 6.5.2.2(b) of Boeing SCD Supplement D3–2888.

(R. 149 Ex. A ¶¶ 36, 39.) I must assess whether this evidence might be sufficient to persuade a reasonable jury that Boeing's failure to enforce its maintainability requirements and to require Crane to submit maintainability data and a maintainability plan was a "substantial factor," *Merco,* 84 Wis.2d at 458, 267 N.W.2d 652, of the pump's design defects and thus of the eventual explosion.

 To be sure, Fed.R.Evid. 705 "allows experts to present naked opinions." *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989). However, where the expert's opinions are supported by "no facts, no hint of

---

28. Plaintiffs needed to provide this evidence in response to Boeing's motion for summary judgment because Boeing argued that its approval process was not designed to ensure safety, and thus indicated that even if it wrongly granted approval, its negligence

could not have caused the explosion. (R. 134 at 12–13.) By contrast, Crane's summary judgment motion did not refer, even in passing, to any of the elements of the torts alleged by plaintiffs. (R. 88 at 2, 6, 42.)

an inferential process, no discussion of hypotheses considered and rejected," they are of no use to a fact-finder. *Id.* A non-moving party may not defeat summary judgment merely by relying upon the statement of an expert who "does not recite any of the specific facts or steps in his reasoning that led him to the conclusion stated in ... his affidavit." *Id.* at 1341 (Ripple, J., concurring) (quoting *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 693 F.Supp. 666, 669–70 (N.D.Ill.1988)). Likewise, "Absent some information on [an expert's reasons], his naked conclusion is wholly uninformative and entitled to no weight." *Weigel v. Target Stores,* 122 F.3d 461, 469 (7th Cir.1997). Thus, "a party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue, a conclusion for which the expert cannot offer any substantiation." *American Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1464 (7th Cir.1996) (Posner, C.J., dissenting).

Here, even drawing all reasonable inferences in plaintiffs' favor as the non-moving parties, as I must under *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348, Cygnor's declaration falls short of the required standard. Cygnor asserts, without giving reasons, that Boeing failed to enforce its maintainability requirements and that this resulted in unsafe design defects. This is similar to the experts' unsupported conclusions in *Weigel,* 122 F.3d at 469 (asserting, without giving reasons, that "there was a good chance" that the plaintiff could return to work), and in *Mid–State Fertilizer,* 877 F.2d at 1339 (asserting, without giving reasons, that "the handling of the loan arrangement ... was not an appropriate traditional banking practice.").

A reasonable jury could not find for plaintiffs on the strength of Cygnor's statement without supplying a host of additional facts and a theory to link them. First, the statement does not assert that soldering and potting are required for maintenance, and plaintiffs have provided no evidence whatsoever from which a jury could conclude that they are. Second, plaintiffs have provided no information about how Boeing conducted (or should have conducted) its maintainability reviews, or what use Boeing would (or should) have made of the absent maintainability data and maintainability plan. There is thus no evidence from which a jury could conclude that, had Boeing conducted a proper maintainability review, it would have denied Design Proposal Approval to Crane's proposal. Third, even if Boeing had asked Crane to redesign the pump to allow for easy soldering and potting, there is no evidence that Crane would have done so.[29] Fourth, even if Crane had made it easier to solder and pott the motor lead wires (or devised a strategy which made soldering and potting unnecessary), there is no evidence that its changes would also have had the happy—and incidental—effect of avoiding some of the pump's alleged safety problems. Cygnor's declaration gives me one scant fact—some of the same alleged defects which posed a safety problem also made soldering and potting difficult—and "no hint of an inferential process, no discussion of hypotheses considered and rejected." *Mid–State Fertilizer,* 877 F.2d at 1339. It is not the court's role to supply the additional facts, and a theory to link them, needed to justify an expert's conclusory assertions. Thus, plaintiffs have not provided adequate evidence that Boeing's alleged failures regarding the maintainability requirements in its SCD Supplement were a "substantial factor," *Merco,* 84 Wis.2d at 458, 267 N.W.2d 652, in the pump's allegedly dangerous design. Boeing is accordingly entitled to summary judgment on negligence, as well as strict liability and breach of warranty.

## VII. PUNITIVE DAMAGES AGAINST CRANE

Plaintiffs seek punitive damages against Crane; Crane argues that

---

**29.** Indeed, it would have required reworking much of the pump, because correcting the 90° turn would have required changing the entire pump's orientation.

they do not apply. To be awarded punitive damages, a plaintiff must establish "malice, vindictiveness, ill-will, or wanton, willful or reckless disregard of plaintiff's rights." *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 308, 294 N.W.2d 437 (1980).[30] Although the defendant's conduct need not be intentional, *id.* at 266, 294 N.W.2d 437, the requirement of wanton, willful or reckless disregard has been interpreted as requiring that the plaintiff show that the defendant had specific knowledge of the particular defect, *Walter v. Cessna Aircraft Co.,* 121 Wis.2d 221, 227, 358 N.W.2d 816 (Ct.App.1984), and took "conscious action in disregard of the rights of others," *Wangen,* 97 Wis.2d at 267, 294 N.W.2d 437 (quoting 4 Restatement (Second) of Torts, § 908, cmt. b (1977)).

█ Plaintiffs contend Crane knew of defects and consciously disregarded them in two areas: explosion proof testing and the possibility of burrs on the inside of the pump abrading the motor lead wires. The second area may be quickly addressed. Plaintiffs argue that although Crane was well aware that the motor lead wires could be damaged by rubbing against the interior of the pump, Crane never warned the government of the danger. (R. 147 at 7–10.) Crane's knowledge is evidenced by a 1962 Crane Engineering Change Proposal (ECP) to chamfer the edges of the upper vent hole, specifically "[t]o prevent wire damage." (R. 146 Ex. 9.)

The very document on which plaintiffs rely to establish Crane's knowledge of danger—the ECP requiring chamfering of the vent hole—also establishes that punitive damages are inappropriate, because it shows that Crane took affirmative action to reduce the danger. Although merely taking action may not be enough to prevent a finding of negligence—it might have been the wrong kind of action, or not enough, and warning the government might have been required—Crane's affir-

matively seeking to reduce the danger is enough to establish that it did not act with "reckless indifference to or disregard of the rights of others." *Wangen,* 97 Wis.2d at 267, 294 N.W.2d 437. It does not demonstrate "an indifference on the person's part to the consequences of his or her actions." *Sharp v. Case Corp.,* 227 Wis.2d 1, 21, 595 N.W.2d 380 (1999). Thus, plaintiffs are not entitled to punitive damages on this issue.

█ I turn now to the explosion proof testing issue. Crane conducted explosion proof testing on June 5, 1961; plaintiffs contend that Crane knowingly avoided ever explosion proof testing the upper vent hole (which they argue was added to the design more than three weeks later), and moreover submitted false Qualification Test Reports. (R. 147 at 3–7.) As discussed above, plaintiffs have provided considerable evidence that the upper vent hole was not in place on June 5, 1961: The drawing revision which incorporated it was dated more than three weeks later, and the schematic diagram of the explosion proof testing describes spark plugs a certain distance from three other vent holes, but says nothing about an upper vent hole. Crane relies on the deposition testimony of one of its experts, R. Douglas Marwill, that prior to the June 29, 1961 revision, the drawings for what became the RR12280 were in the P, for "prototype," P1547 series, which did not require promptly recording design changes. Although Marwill testified that he was "sure" the upper vent hole existed on June 5, 1961, he simply restated other information and provided no reasoning from which a fact-finder could come to share his confidence or reach the same conclusion independently: "So the holes could have been there, and if you—in fact, I'm sure it was there, because this drawing and revision date you're referring to, 6/29/61, is the date this drawing was revised to include the changes on the P

---

**30.** Punitive damages in cases commenced on or after May 17, 1995 are governed by Wis. Stat.Ann. § 895.85 (West 1997). Because this case was filed before that, on April 7, 1995, Wisconsin's common law applies.

drawings." (R. 156 Ex. D (Marwill Dep. 12/2/98) at 62.) I draw the inference in plaintiffs' favor as the non-moving parties that the upper vent hole did not exist when the explosion proof testing was done, and that Crane was aware of that.[31]

In its reply brief, Crane gives a variant on a causation argument already discussed above: even if Crane had explosion proof tested a version of the pump without an upper vent hole, it would have no bearing upon punitive damages, because the testing was designed to make sure that the pump would not emit sparks and flames—rather than molten metal—and so, even if done correctly, the testing would not have prevented the explosion at issue here. (R. 156 at 9–10.) While plaintiffs must eventually provide specific causal evidence linking the explosion proof testing defects they allege with the explosion which occurred, it would be improper to dismiss any element of their case for failing to provide evidence on issues that defendants' summary judgement motions did not raise. *See Hartman*, 4 F.3d at 469. For summary judgment purposes, I draw the inference in plaintiffs' favor as the non-moving parties that the explosion proof testing, had it been done correctly, would have revealed some of the design defects plaintiffs allege.

It is undisputed that one of the purposes of the explosion proof testing was to ensure that the pump could be operated safely. (R. 112 Ex. 14, ¶ 4.5.23.1(a).) Moreover, Crane affirmed in its Qualification Test Reports that it had conducted the explosion proof testing in accord with Boeing's specifications. (R. 89 Ex. 37 (*intend-ed to be* Ex. 18) (TR–996.) ¶ 6.1.14 ("test conducted per the Boeing spec"); Ex. 34 (TR–1307) ¶ 6.4 (same).) The Boeing SCD, as discussed above, incorporated the military specifications by reference. Because I draw the inference in plaintiffs' favor as the non-moving parties that Crane did not comply with the explosion proof testing specifications, these Qualification Test Report affirmations must be treated as deliberate falsehoods for purposes of this motion.

■■■ The question for decision is whether the type of knowledge Crane had is sufficient to allow a jury to consider awarding punitive damages.[32] "Some type of knowledge is a necessary component to the imposition of punitive damages because an alleged wrongdoer who is unaware of a product's defect cannot be recklessly disregarding the rights of another person." *Sharp*, 227 Wis.2d at 23, 595 N.W.2d 380 (citing *Walter*, 121 Wis.2d at 227 n. 2, 358 N.W.2d 816).

Inferring as I must for summary judgment purposes that Crane knew that its explosion proof testing was defective and deliberately concealed that knowledge in its Qualification Test Reports, a reasonable jury could find that Crane acted with conscious or reckless disregard for others' rights. *Sharp* allowed punitive damages to go to the jury in part because of "[i]nadequate or defective design or pre-sale testing." 227 Wis.2d at 24, 595 N.W.2d 380.[33]

Other states have likewise held that inadequate or defective testing (to be sure,

---

31. In addition, also as discussed above, plaintiffs have provided substantial evidence that Crane did not operate the pump during the explosion proof testing, in direct contravention of the relevant military specifications. Crane appears to concede the point, although it argues that Boeing implicitly waived the government requirement. (R. 116 at 8.) Crane does not claim that it ever notified or warned the government that it had not complied with the military testing specification. However, plaintiffs have not yet had occasion to present causal evidence that, had this aspect of the testing been done correctly, the design defects they allege would have been discovered.

32. Neither party has addressed this issue in its briefs.

33. This case did involve more than just inadequate testing. *See Sharp*, 227 Wis.2d at 24–26, 595 N.W.2d 380. As suggested in the body of the text, I believe that Crane's false certifications that all testing was done properly (if proven) goes quite some distance to replace these additional factors.

frequently in conjunction with knowledge of actual defects and failure to warn customers of known defects) is sufficient to uphold an award of punitive damages. An empirical study found that inadequate testing and quality control was the central issue in twelve percent of personal injury cases resulting in punitive damage awards. *See* Michael Rustad, *In Defense of Punitive Damages in Products Liability*, 78 Iowa L.Rev. 1, 70 (1992). *See, e.g., Oberg v. Honda Motor Co.*, 320 Or. 544, 888 P.2d 8, 13 (1995) (inadequate roll-over tests for off-terrain vehicle, combined with actual knowledge of roll-overs); *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568, 580 (1981) (inadequate testing of jeep's ability to survive roll-over sufficient to justify punitive damages). *See also Gryc v. Dayton–Hudson Corp.*, 297 N.W.2d 727, 734 (Minn.1980) (sleepware maker could not overcome punitive damages by observing that product had passed flammability test it knew to be invalid).

Although not a product liability suit,[34] I find helpful a Missouri opinion addressing a distributor and installer of milking equipment which negligently failed to test for stray voltage. The Missouri Supreme Court there held that punitive damages could be awarded only on a showing that the defendant "knew or had reason to know that by failing to test for stray voltage it was creating an unreasonable risk." *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 436 (Mo.1985) (en banc). The court suggested:

> The analogy can be drawn to a mechanic who fails to test the brakes on a car. Assuming that the examination should have been conducted, the mechanic is negligent but not liable for punitive damages unless it can be shown that he or she knew or had reason to know that the brakes were faulty and thus a sub-

stantial likelihood existed that the brakes would fail and result in great bodily harm. Such is the critical difference between negligence in order to establish liability and reckless conduct which would justify a punitive damage award.

*Id.* Here, in contrast to a merely negligent mechanic who fails to realize that the brakes should be tested, Crane (on plaintiffs' analysis, discussed above) knew or had reason to know that the pump's design was faulty. Crane not only undertook to conduct explosion proof testing, in full awareness that the pump would be operated in an "explosive environment," (R. 88 at 40), but also, on the facts as I infer them for the purpose of this motion, falsely held itself out as having conducted the testing according to specifications. It is undisputed that the military required the pump to pass the military specifications before a procurement contract could be signed. Crane's alleged conduct is thus similar to a mechanic specifically hired to perform a multi-point test of a car, including its brakes, in full awareness that any untested defects would be likely to cause substantial harm, but who nonetheless takes shortcuts in testing the brakes and moreover certifies in writing that the test was done per specifications.

One final argument needs to be addressed. Crane contends that even if it did add the vent hole after the explosion proof testing, its engineers had no reason to think that doing so would endanger anyone; it is undisputed that identical vent holes passed the explosion proof testing. (R. 132 at 13; R. 156 at 9.) Thus, Crane argues, its alleged misconduct falls short of acting in conscious disregard of others' rights.

This might be analogized to the mechanic's justifying taking shortcuts on the ground that those parts of the brake tests which were done correctly did not indicate

---

**34.** Indeed, perhaps defective testing should be thought more akin to defectively rendered services than to defective products.

any problem. I believe that whether this is enough to excuse the shortcuts which were taken, and then falsely certifying that all testing was done correctly, is a jury question. *See Walter,* 121 Wis.2d at 235, 358 N.W.2d 816 (holding that various of defendant's claims tending to undercut punitive damages were best considered by jury); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2729.1 (3d ed.1998) (observing that because punitive damage claims require inquiry into defendant's state of mind, summary judgment is rarely appropriate).

To sum up, defective testing alone can justify punitive damages. "The inquiry here is whether the manufacturer's testing and examination procedures were so inadequate as to manifest a flagrant indifference to the possibility that the product might expose consumers to unreasonable risks of harm." David G. Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1258, 1340 (1976).[35] The Wisconsin Supreme Court allows a jury to consider punitive damages based in part on inadequate or defective testing. *Sharp,* 227 Wis.2d at 24, 595 N.W.2d 380. Crane's false certification that the testing was done properly (for so I infer for purposes of this motion), combined with the safety risk of taking shortcuts in the testing, is additional flagrant conduct which, if proven, could justify a jury in awarding punitive damages. On this issue, therefore, Crane's motion for summary judgment is denied.

**IT IS HEREBY ORDERED** that defendant Boeing's motion for partial summary judgment dismissing plaintiffs' claims for punitive damages is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiffs' motion to dismiss Underwriters of Lloyds of London is **GRANTED** and that Underwriters of Lloyds of London are hereby **DISMISSED.**

**IT IS FURTHER ORDERED** that defendant Crane's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that defendant Boeing's motion for summary judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Crane's motion for partial summary judgment as to punitive damages is **GRANTED IN PART AND DENIED IN PART:** granted with respect to plaintiffs' claims regarding knowledge that vent hole edges could cut wires, and denied with respect to plaintiffs' claims regarding defects in explosion proof testing and corresponding Qualification Test Reports.

---

**35.** Owen's influential article is cited as "persuasive" in *Wangen,* 97 Wis.2d at 290, 294

N.W.2d 437.